SHELBY COUNTY R–IV SCHOOL DIS-
TRICT et al., Respondents,

v.

William H. HERMAN, Appellant.

No. 50969.

Supreme Court of Missouri,
Division No. 1.

July 12, 1965.

Charles E. Murrell, Jr., Edina, Henderson & Boulware, Shelbina, for appellant.

Bollow, Crist & Bollow, Shelbina, for respondent.

Norman H. Anderson, Atty. Gen., Louis C. Defeo, Jr., Asst. Atty. Gen., Jefferson City, for amicus curiae.

HOUSER, Commissioner.

Condemnation by a school district of 45 acres of a 245-acre farm in Shelby County. Commissioners awarded landowner $11,962. Trial of his exceptions to the commissioners' award resulted in a jury verdict of $12,456.33. Landowner appeals from the judgment entered upon the verdict.

Since landowner claimed damages in excess of $78,000 and offered evidence in support thereof we have jurisdiction of this appeal, as the amount in dispute exceeds $15,000. State ex rel. Kansas City Power & Light Co. v. Salmark Home Builders, Inc., Mo. Sup., 350 S.W.2d 771; State ex rel. State Highway Comm. v. Howald, Mo.Sup., 315 S.W.2d 786; Constitution, Art. V, § 3, V.A.M.S.

The first question is whether Shelby County R–IV School District has the power of condemnation.

 We are of the opinion that this school district is a town school district, and that as such it has this power. Section 165.010(3), V.A.M.S., provides that *"All districts governed by six directors and in which is located any city of the fourth class, * * * are town school districts."* (Emphasis ours.) Shelby County R–IV School District is governed by six directors. In it are located the cities of Clarence and Shelbina. We take judicial notice of the organization of cities of the fourth class, § 79.010, V.A.M.S.; City of Savannah v. Dickey, 33 Mo.App. 522, and we judicially notice that Clarence and Shelbina are cities of the fourth class. Therefore, Shelby County R–IV School District is a town school district, which is specifically granted the power of eminent domain. §§ 165.100 and 165.327, V.A.M.S.

The fact that it came into being by reorganization under §§ 165.657–165.707, V.A.M.S., does not militate against the fact that it is a town district. In Vanlandingham v. Reorganized School Dist. No. R–IV, Mo. Sup., 243 S.W.2d 107, a reorganized school district was recognized as a town school district. Our conclusion is confirmed by § 165.687, V.A.M.S., which provides that the directors whose election is provided for in enlarged or "reorganized" districts "shall be governed by the laws applicable to six-director school districts" (*inter alia,* town districts).

Landowner takes the untenable position that a reorganized school district is a new creature of the law—a corporate school entity separate and apart from common, consolidated, town and city school districts; that as such it has no power to condemn because that power is not mentioned in the laws applicable to the reorganization of school districts (§§ 165.657–165.707). There is no basis for this argument. Section 165.010 classifies into *four* classes (common, consolidated, town and city) the public school districts organized under *any* of the laws of this state. Section 165.010 in its present form was enacted by Laws 1955, p. 533, after the enactment of §§ 165.657–165.707, and therefore in contemplation thereof. Reorganized school districts, as such and by that name, are not included in the statutory classification. If we adopt landowner's contention we would judicially add a fifth class of school districts to the four provided for by § 165.010. Sections 165.657–165.707 do not expressly, or by implication, create a new fifth class of school districts, actually or by name. In those sections the district to be reorganized is referred to 16 times as the "proposed" or the "enlarged" or the "new" district; only once as the "proposed reorganized district." And in referring to the district after reorganization it is referred to 26 times as the "enlarged district" or the "enlarged school district(s)." Only twice in the 17 sections is there a reference to a "reorganized district," and that occurs in § 165.685 in an adjectival sense only. Looking at the substance of these 17 sections, they deal only with the method of enlarging districts under reorganization plans by which smaller units are combined into larger units in order to make better provision of schools and school facilities. They do not undertake to provide for so-called reorganized districts a comprehensive scheme prescribing the general powers, duties, and procedures for the operation and workings of the schools therein. These matters are provided for in §§ 165.163–165.260 for common school districts; in § 165.263 et seq., for city, town and consoli-

dated districts. There are special provisions applicable to school districts in cities of certain population. §§ 165.315, 165.377–165.553, 165.563–165.653.

The term "reorganized school district" is a popular term, used for administrative purposes, without legal significance in the classification of school districts as bodies corporate under the school laws of this state. A reorganized school district, by that name and as such, is not a political entity.

■ Next, landowner contends that the school district "did not comply with the provisions of law to become a reorganized school district," but does not assign reasons for this contention, or why or in what manner it failed to comply with the law. Therefore nothing has been preserved for appellate review under this point. Civil Rule 83.05(e), V.A.M.R.

■ Finally, landowner contends that the school district did not endeavor in good faith to agree with landowner upon proper compensation to be paid him for his land. The evidence discloses that on January 3, 1964 the board of education voted to get in touch with landowner and start negotiations for 40 to 50 acres at $300 per acre. Mr. Nevins, superintendent of schools, and two board members journeyed to Freeburg, Illinois where they talked to landowner, who stated that he did not wish to and would not sell the tract in which the school district was interested; that he would rather have his right arm taken than have part of his farm taken from him. Landowner told school district representatives to go ahead and condemn the land. No

offer was made in view of landowner's attitude. Later offers of $225, $250 or $300 an acre were made by Mr. Nevins and rejected by landowner, who stated that he did not want to sell for the amount offered. There were communications by mail, in at least one of which an offer of $250 or $300 an acre was made. The letter went unanswered. One board member talked to landowner "the better part of two hours" about purchasing the land. On April 10, 1964 the board authorized Mr. Nevins to offer $13,500 for the acreage desired ($300 per acre). An offer was made verbally and in writing, describing the land required. Landowner read the offer and refused it in the presence of Mr. Nevins. On April 14, 1964 the petition in condemnation was filed. We find no evidence of bad faith on the part of the representatives of the school district and therefore good faith on its part is not a subject for our consideration. School Dist. of Clayton v. Kelsey, 355 Mo. 478, 196 S.W.2d 860, 862.

The power to condemn being established, we turn to three alleged errors relating to the exclusion of evidence.

First, error in striking landowner's testimony as to the reasonable market value of the farm before and after the taking. Landowner disclosed that his method of arriving at reasonable market value was to take the net profit from the 94.6 tillable acres and capitalize that figure at 4%. He testified that the income from the farm had increased "wonderfully" in recent years, "due to a good operator." He further testified to the following facts with reference to the income from the farm:

| year | gross income | expenses | net profit |
|------|-------------|----------|-----------|
| 1960–61 | 2,791.07 | 604.61 | 2,186.46 |
| 1961–62 | 4,111.26 | 965.80 | 3,145.46 |
| 1962–63 | 4,008.38 | 920.25 | 3,088.13 |
| 1963–64 | 8,324.17 | 1,764.50 | 6,559.67 |

Landowner farmed the land on a 50–50 basis, dividing the expenses and profits equally with his tenant. Landowner selected the crop year 1963–64 as the basis for

his computation. Capitalizing the figure 6,559.67, he gave as his opinion that the reasonable market value of the whole farm prior to the taking of the 45 acres was $163,990, and after the taking was $85,982.50. On motion of the school district this testimony was stricken. Landowner claims that he was qualified and entitled to express his opinion of fair market value on this basis; that he was the owner of the land and knew what the land produced. Condemnor claims the court correctly struck the landowner's opinion as to value because it was incredible and manifestly untrue; that there is no rural acreage in northeast Missouri of comparable location and size that has a market value approaching $669 per acre for the whole farm and in excess of $1,700 per acre for 45 acres; that landowner used an improper standard and element in arriving at the value of the land (capitalizing the net profits of his best year and not excluding the tenant's share from the computation); and that landowner was a nonresident of Missouri, not shown qualified to testify as to land values in Shelby County.

■ The court did not err in striking landowner's opinion evidence of value. While ordinarily the owner of real property is held competent to testify as to its reasonable market value, 5 Nichols on Eminent Domain § 18.4 [2]; 1 Orgel on Valuation under Eminent Domain, 2d Ed., § 132, p. 567, and his estimate is received notwithstanding that he has not qualified as an expert, 32 C.J.S. Evidence § 546(120); 20 Am.Jur. Evidence § 892, upon the assumption that he is particularly familiar with it and knows of the uses to which it is particularly adaptable, his opinion is without probative value where it is shown to have been based upon improper elements or an improper foundation. Mayor, etc. of City of Liberty v. Boggess, Mo.Sup., 321 S.W.2d 677 [4, 5]; State v. Larson, 54

Wash.2d 86, 338 P.2d 135. Landowner did not give his opinion of the reasonable market value before and after the taking, and stop. He prefaced his estimate of market value with the statement that he had "a different method of figuring the value of this land," by which he based his estimate exclusively upon capitalization of net profits in the operation of the farm. Evidence of profits derived from a *commercial* business upon land taken for public use is ordinarily inadmissible as a basis upon which to ascertain market value in condemnation proceedings because it is too speculative, remote and uncertain. St. Louis Housing Authority v. Bainter, Mo.Sup., 297 S.W.2d 529, and authorities cited, I.c. 534 [6, 7]. There is a division of authority on the question whether net revenue from the use of land for agricultural purposes is admissible in condemnation proceedings for the purpose of ascertaining the reasonable market value of land, Orgel on Valuation under Eminent Domain, Vol. 1, § 166; Jahr, Eminent Domain, Valuation and Procedure, § 151; 4 Nichols on Eminent Domain, § 12.312 [1], but this case was tried without any objection to the admission of evidence of gross revenue, expenses and net profits realized, and no issue is raised on this appeal as to its admissibility. The question therefore is whether, *under this evidence*, the landowner should have been permitted to give an estimate of the value of the farm based exclusively upon the capitalization of net profits for one particular year, 1963–64, which was the most profitable year of his experience in operating the farm. The very statement of the question suggests a negative answer. Landowner's witness Bowzer testified that he did not use the capitalization of income method of appraisal "because last year, especially, was a good crop year, which was one of the best in this area of the state—well, the fact is in this particular area, I think by the Agricultural Department, information came out that there was a 6% higher yield last year

than in any previous history. So I don't think it would give a good picture as to the worth of the land." The capitalization of income method must be based upon a foundation which minimizes, so far as possible, conjecture and uncertainty. State v. Bare, 141 Mont. 288, 377 P.2d 357. The fluctuation and uncertainties of yields, weather, markets, supply and demand, costs, skill, efficiency and wisdom in the operation, etc. immediately suggest themselves. Mr. Herman himself attributed the good results in recent years to the fact that he had "a good operator." The validity of an opinion based upon capitalization of income would depend upon the selection of an income figure which was relatively stable, average and representative—of which there was reasonable probability of permanence or persistence in the future. An opinion based exclusively upon a highly variable factor, which the net income from this farming operation was affirmatively shown to be, would be without probative value. Furthermore, landowner used 100% of the net profits as the figure for computation. This was improper for the reason that he did not get 100% of the net profits. Using the figure 6,559.67 did not take into account the fact that landowner received only 50% of that figure. The other 50% went to the tenant. Finally the capitalization of income method of appraisal applies only where there has been a complete taking, and there is no basis for the application of such a method where there is only a partial taking. Humble Oil & Refining Co. v. State of New York, 15 A.D.2d 686, 223 N.Y.S. 2d 448, aff. 12 N.Y.2d 861, 237 N.Y.S.2d 338, 187 N.E.2d 791.

Next, error in not permitting landowner to explain the circumstances surrounding the payment of $4,050 for the land in 1941. On cross-examination the school district elicited from the landowner, without objection, that he purchased the land in 1941 for $4,050. Landowner's attorney asked him

on rebuttal how he acquired the farm. Landowner answered that he acquired it by attending a sheriff's sale in order to protect a $2000 loan his wife had on that farm. This answer was stricken, and an objection was sustained to the question "What foreclosure sale did you buy this land at?" Then landowner made an offer of proof that he bought the land at a sheriff's sale foreclosing a deed of trust; that $18,000 of notes were secured by the deed of trust; that $15,000 was owed on these notes at the time of the foreclosure sale, and that he bid and bought the land at the foreclosure sale for $4,050. In rejecting the offer of proof the court stated that the deed of trust did not reflect the true value of the property, and that the evidence was not competent.

■▬▬▬ Neither the evidence that the land was bought for $4,050 nor the evidence contained in the offer of proof was admissible. The purchase price 23 years before the valuation date, in an entirely different economic era, would be so remote in point of time as to afford no fair criterion of value at the date of valuation. City of St. Louis v. Paramount Shoe Mfg. Co., 237 Mo. App. 200, 168 S.W.2d 149, 155. The offer of proof did not disclose the date on which the $18,000 deed of trust was placed upon the property, but it must have been prior to 1941, which would have made the evidence contained in the offer of proof even more remote. In State ex rel. State Highway Commission of Missouri v. Pope, 228 Mo. App. 888, 74 S.W.2d 265, the court of appeals upheld the exclusion of evidence in 1932 of what the property cost the landowners in 1928, and the amount of the mortgage held against the property, on the ground that it related to a time too remote to be of value or competent in estimating the market value of the property five years later during a period when property had greatly depreciated in value generally. The same result must follow where the time lapse is at least 23 years, during which period land values have greatly appreciated.

If landowner in the first instance had objected to the inquiry as to purchase price the court undoubtedly would have sustained the objection and eliminated the problem, from landowner's standpoint. Landowner did not object. Instead, he made the answer which he now considers had a discrediting effect upon his case. Whether the trial court should have permitted him to go into this collateral matter for the purpose of explaining his testimony and attempting to rebut the inference that the land was worth only $4,050 in 1941 was a matter within the discretion of the court. State ex rel. State Highway Commission v. Bengal, Mo.App., 124 S.W.2d 687, 689. We find no abuse of discretion in the action of the court.

Finally, error in striking the testimony of landowner's expert witness Harold Miller that the condemned land located on U. S. Highway 36 had commercial value; and in not permitting landowner's expert witness Darrell Bowzer to answer the question what value, if any, there would be in having the farm fronting on U. S. Highway 36.

Harold Miller testified that the 245-acre farm lay on the north side of U. S. Highway 36 and had "valuable highway frontage over one-half mile." He testified that the 245-acre farm would find a ready buyer on today's market at $36,000 before the 45 acres was taken, and that the value of the 200 acres after the 45 acres was taken was $15,000. Asked if this frontage on Highway 36 and on the county road on the east (¾ mile) had "any effect on the value of the land" he answered "It's one of the most important factors in the market value of land today, highway location." Asked on direct examination "Do you think that this land fronting on highway 36 has any value for commercial purposes?," counsel for the school district obtained the permission of the court to ask questions touching his qualifications, preliminary to the making of an objection. As a result of these questions the court sustained an objection that the

witness had no experience in commercial properties and was not qualified to express an opinion thereon as an expert. After further questioning by landowner's counsel, however, the court permitted the witness to give his answer that the land fronting on the federal highway does have commercial value. Mr. Miller gave this explanation: "Due to the fact that the property has the highway frontage and the access to the north, which I think you are aware that on federal highways there are limited access which is always a possibility, and due to the fact that this road turns to the north along the east side of the property, will always leave the southeast corner of the property open, even though there should be limited access in that area. This is recognized as a commercial spot for that reason." On cross-examination the matter of qualifications was pursued further, the objection to the testimony regarding commercial value of the land was renewed and the request was made that it be stricken and the jury instructed to disregard any portion of Mr. Miller's testimony based on commercial value. The court finally reversed its ruling, sustained the objection, and instructed the jury to disregard the testimony.

Mr. Miller, age 48, had farmed all his life and had become a real estate broker in 1957. He had an opinion as to the value of real estate in and around Shelby County. He had sold farms in and around Shelby County, Missouri, elsewhere in the northern half of Missouri and in southern Iowa and Illinois. He dealt mostly in farm properties. As a real estate broker Mr. Miller had listings and inquiries about commercial properties, but outside of one 40-acre tract with no commercial building on it that he and another had purchased Mr. Miller had had very little experience in selling filling stations, groceries and commercial property. At the moment he could not remember any other commercial sale that he had made, although he "imagined" there were some, if he could refer to his records; that "we" (he and the firm where he was employed) had made hundreds of

sales. He was familiar with the Herman farm; there was no limited access at the point of the Herman farm at that time; it was not "posted" on the Herman property as a limited access situation.

Darrell Bowzer testified that he was a farmer; that he had done appraisal work, right-of-way work; quite a few appraisals for the City of Hannibal, the U. S. Corps of Engineers and the Bear Creek Dam Project; had made appraisals on land of the general character here involved; had examined this property; belonged to the American Society of Appraisers and the American Right-of-Way Association, and made his living by appraising property. He used the summation approach or comparable sales method, or both methods, to determine market value. He did not use the capitalization method in this case for the reasons previously stated under another point. In his opinion the fair market value of the Herman property before the taking was $41,012.20 and after the taking was $20,000. After describing the characteristics of the land Mr. Bowzer was asked "What value, if any, would there be to having the farm fronting on U. S. Federal highway 36?" Objection was made on the ground that he had not been qualified to express such opinion. Asked if he was familiar with the value of commercial property fronting on U. S. Highway 36 in and around Shelby County, he answered "Well, not in this particular area, except for one commercial property that was brought up in court here today, * * *." This referred to a sale of a tavern 1¼ miles east of Clarence, for $500. The court sustained the objection on the ground that Mr. Bowzer was not qualified as an expert to give testimony as to the commercial value of the Herman farm. On cross-examination Mr. Bowzer testified that in arriving at the $41,022.20 figure he did not take into consideration the commercial possibilities of the land, but that he did take into consideration its location; that the location is a major factor in the value of land; that the fair market value of land on a major highway is higher than

that of land off the highway; that it is more desirable; that people pay more for it because they have better access to the major areas; that this land is more desirable property because it is on a major highway.

 In our judgment the rights of the landowner have not been prejudiced by the court's rulings. Whether a particular witness is qualified to give opinion evidence as to the market value of land in a condemnation proceeding is a question for the court to determine in the exercise of a sound judicial discretion. State ex rel. State Highway Comm. of Missouri v. Craighead, Mo.App., 65 S.W.2d 145, 149 [7]; State ex rel. Highway Comm. of Missouri v. Williams, 227 Mo.App. 196, 51 S.W.2d 538. In order for an expert witness to be qualified it must appear that by reason of education or specialized experience he possesses superior knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion or of drawing correct conclusions. Giambelluca v. Mo. Pac. R. Co., Mo.Sup., 320 S.W.2d 457 [2]; Wipfler v. Basler, Mo.Sup., 250 S.W.2d 982, 988 [14]; 32 C.J.S. Evidence § 457, p. 100. As to commercial values there was no such showing as to either Mr. Miller or Mr. Bowzer. From the fact that these witnesses qualified as experts on the value of this property as farm land it does not follow that they were qualified as experts on the value of farm lands for commercial purposes. State ex rel. State Highway Comm. v. Riggs, 226 Mo.App. 1053, 47 S.W.2d 178, 182. Even if qualified by experience, any testimony they would have given would have been speculative under the state of the record, for there was no proof or offer of proof that land in the vicinity of the Herman farm had sold or was being used or was adaptable or suitable for commercial purposes, or that there was any present demand for land in that vicinity for commercial purposes, or any reasonable expectation that such a demand would arise in the near future. The only basis Mr. Miller gave for his conclusion that it had commercial

value was that the southeast area of the farm would always be "open" because the county road running along the east side of the property would give access to the farm even though a limited access highway should be built in that area. There was no evidence that a limited access highway was planned in that area. Mere speculative uses cannot be considered. Union Electric Co. v. McNulty, Mo.Sup., 344 S.W.2d 37, 40. The court did not abuse its discretion in striking Mr. Miller's testimony on the ground that his experience did not enable him to form an opinion having probative value superior to that of the jurors with reference to the value of this land for commercial purposes. We note that Mr. Miller *was* permitted to testify that in arriving at his valuation he gave some weight to the fact that the land was located on the federal highway—that he gave it a "location" value, and that if the land had not been located on the federal highway his valuation would have been "considerably less."

Reversible error is not shown in the action of the court sustaining an objection to the question asked Mr. Bowzer what value if any there would be to having the farm fronting on the federal highway, because thereafter he was permitted to testify that he took into consideration the location of the land on a major highway. The exclusion of testimony when first offered is not erroneous where the record shows that it was later admitted. State ex rel. State Highway Commission v. Devenyns, Mo. App., 179 S.W.2d 740, 741.

The judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.