STATE of Missouri ex rel. STATE HIGH-
WAY COMMISSION of Missouri,
Plaintiff-Respondent,

v.

SOUTHERN DEVELOPMENT COMPANY
and the Kansas City Southern Railway
Company, corporations, Defendants-Appel-
lants.

No. 56949.

Supreme Court of Missouri,
Division No. 2.

April 8, 1974.

Motion for Rehearing or to Transfer to
Court en Banc Denied May 13, 1974.

Robert L. Hyder, Earl H. Schrader, Jr., Minor C. Livesay, Frank O. Benson, Kansas City for plaintiff-respondent.

Robert D. Youle, Thomas J. Wheatley, Kansas City, for defendants-appellants; Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, of counsel.

FINCH, Judge.

This is a condemnation suit wherein the State Highway Commission (SHC) acquired right-of-way easements for construction of a portion of Interstate Highway I-435, a circumferential highway around Kansas City. Commissioners who were appointed awarded $850,000 to Southern Development Company (Development) and $5,000 to Kansas City Southern Railway Company (KCS). Following trial in which the jury awarded them damages of $166,000 and $9,000, respectively, defendants have appealed. Since defendants' evidence supported damages in the amounts of $916,650 and $10,855, respectively, and this appeal was taken prior to January 1, 1972, we have jurisdiction on the basis of the amount involved. We reverse and remand.

In this suit SHC undertook to condemn right-of-way easements for approximately two miles of the route for I-435. The petition sought 82 acres of the 1481 acres then owned by Development and 1.67 acres of the 19.31 acres owned by KCS. Location of the lands owned by these defend-

ants at the time of the taking, including the right-of-way condemned for I–435, was shown on Defendants' Exhibit 2, as follows:

[A9678]

The property owned by Development is designated on the foregoing exhibit as Tracts 2, 2A and 2B. KCS owned the long narrow strip known as the Hawthorne Lead Branch located between Tracts 2A and 2B. SHC condemned 0.86 acres from that strip. In addition, it condemned 0.81 acres from what was known as the Air Line Branch which was to the south of the foregoing tracts and does not appear on Defendants' Exhibit 2.

KCS is an operating railroad and Development is its wholly owned subsidiary engaged in landowning and development operations for the mutual benefit of the two companies. By the early 1950's Development had assembled for use as an industrial park a total of 1784 acres located south and west of the Missouri River and north of Blue River in the area generally referred to as the Northeast Industrial District of Kansas City. In the western portion of this tract Development had installed sewers and utilities and had dedicated some streets, including Front Street. By the time this condemnation suit was instituted, Development had sold some 28 tracts, consisting of approximately 303 acres, to 26 different business concerns. The size of the tracts varied from slightly more than one acre up to 50 acres. A considerable number of the tracts were sold in the west area where the improvements had been installed. The larger tracts, particularly the ones sold to Kansas City Power & Light Compay and Chemagro Corporation, were in the eastern end of the industrial park.

Since the proposed I–435 crossed the KCS tracks at two places, SHC, as required by § 389.640, RSMo 1959, V.A.M.S., submitted to the Missouri Public Service Commission for approval the planned grade separations at those two locations. The Commission approved the plans as submitted. Construction plans which conformed to that approval were filed in the condemnation proceeding, and subsequently the grade separations were so constructed.

In support of their claim for damages, defendants used as their expert witness on value Donald T. McMahon, who had been involved in the acquisition of and sales from this industrial park as well as having similar experience with other industrial tracts. He testified that the fair market value of Development's property before the condemnation was $13,112,000 and that the fair market value after the taking was $12,019,450, or a decrease in fair market value of $1,092,550. In explanation of this decrease in value, he first detailed the sales previously made, including the fact that most recent sales in the more fully developed west end of Tract 2 had been on the basis of 40¢ to 50¢ per square foot, which, converted to a price per acre, would be $17,424 to $22,000, and that recent sales in Tracts 2A and 2B had been on the basis of $6,500 per acre. Based on his knowledge of the property, including prior comparable sales, he fixed the value of the 62 acres taken from Tract 2 at $10,000 per acre or a total of $620,000, and the 20 acres taken from Tracts 2A and 2B at a value of $6,500 per acre or a total of $130,000.

McMahon also testified as to damage to the remaining portions of the tract resulting from the taking. Severance damage to the 145 acres in Tract 2 lying east of I–435 was fixed at $1,000 per acre or $145,000. Severance damage to the portions of Tracts 2A and 2B lying west of I–435 were fixed at $16,650 and $5,000, respectively. In addition, McMahon testified that after construction of I–435, access to the 346.602 acres in Tract 2A, which were east of I–435, was limited to that provided by the railroad easements granted KCS by Kansas City Power & Light Company, and that the tract was landlocked insofar as access by road was concerned. This, he said, reduced the value of land in that area by $500 per acre or a total of $173,500. However, the trial court subsequently construed the Kansas City Power & Light Company railroad right-of-way easements as permit-

ting construction of vehicular roads and required deduction by McMahon of said sum of $173,500 from his prior total damage figure of $1,092,550.

Defendants also contended at the trial that construction of the Hawthorne Lead Branch grade separation so as to allow room for only one railroad track instead of four, as requested by KCS, would result in inadequate rail service to tracts east of I–435 with a resultant further reduction in value of that land. Development sought by witnesses Smith and Zimmerman to show damage by reason of this item of $235,000. However, for reasons more fully developed subsequently in this opinion, that evidence was excluded. In addition, KCS sought to show a resulting diminution in value of its property of $13,000, but that evidence also was excluded.

The expert witness for SHC was Vincent J. O'Flaherty, an experienced appraiser. He testified that he did not use the comparable sales approach in determining value. By way of explanation, he pointed out that this was a large tract and it would be difficult to find a buyer for the whole property; also that sales were made more difficult by reason of certain deed restrictions applicable to all the property in the industrial park. These restrictions provided that any purchaser agreed that any inprovements placed thereon must have the prior approval of Development, that if at any time a purchaser desired to sell any unimproved part of his tract, he must first offer to sell that portion back to Development on the basis of the original sale price, and that the installation of all spur tracks must have the prior written approval of seller. It was O'Flaherty's contention that all of these factors affected marketability and made it impossible for him to use the comparable sales approach in determining fair market value.

O'Flaherty utilized what he described as a cost of development approach. He first concluded that average sales per year would be 24.75 acres and that based on a total tract of 1481 acres, it would take a period of 61 years to dispose of all the property. Then, on the basis of recent sales to Kansas City Power & Light Company and Chemagro Corporation (but not considering recent sale prices in the portion of the tract which had been improved with streets, sewers, etc.), he determined upon a price of $6,500 per acre. He then adjusted that figure by a $1,000 per acre increase for inflation, thus arriving at a basic value of $7,500 per acre. He then concluded that the rate of sale would be perhaps 30 acres per year, rather than his original estimate of 24.75 acres, reducing the total disposition period to 50 years. Since the money to be derived each year from sales would not be in hand at the first of the year but would take a full year to acquire, he discounted the sums, using the Inwood Tables. He multiplied the yearly income from sales times the discount, then times the total number of years to completely absorb the tract to arrive at a before taking value of $2,450,000 for the tract. Then, considering the addition of the Front Street diamond interchange and the proximity of access of the tract to I–435, he reduced the absorption rate to 28 years, and again discounting and multiplying, arrived at an after taking value of $3,700,000 for a net gain of $1,250,000 as a result of the taking of 82 acres. On that basis, he concluded that Development did not suffer any loss.

O'Flaherty did not testify with respect to a before and after value of the KCS land but did state that it suffered damage in an amount of at least $8,365.

Defendants assert various grounds for reversal and remand of this case for a new trial. One of those grounds is that the trial court erred in refusing Instruction B which would have withdrawn from jury consideration all general benefits to the remaining property of defendants resulting from the condemnation. That instruction was as follows:

"INSTRUCTION NO. B

"In determining the value of defendants' remaining property, you must not consider

any general benefit which is conferred upon all property within useable range of the new highway."

Instruction B was MAI 34.03 verbatim. Notes on Use with reference to that instruction stated, in part, as follows:

"This may be given as a separate instruction or as an addition to the general damage instruction, at the option of defendant. Evidence of general benefits should be excluded upon proper objection, but the withdrawal instruction should nevertheless be proper, because the jury would otherwise take them into consideration in determining fair market value.

\* \* \* \* \* \*

"While Instruction 34.03 is called a 'withdrawal' instruction, its use is not limited to withdrawing evidence which is accidently or improperly admitted. It is intended rather to clarify what the jury is to consider in assessing damages. Instructions patterned after 34.02 are intended to withdraw a specific matter which might otherwise mislead the jury. Instruction 34.03 may be given at the defendant's option while instruction 34.02 may be given only at the discretion of the trial judge."

■ SHC argues that the giving of MAI 34.03 is discretionary, not mandatory, basing that contention on the fact that the word "may" is used in the foregoing Notes on Use in discussing when this instruction is to be given. However, "may," as there used, had reference to defendant's choice between giving 34.03 as a separate instruction or adding it to the general damage instruction. The word "may," as used, does not vest in the trial court a discretion to give or refuse the instruction if requested. This is clear from the last sentence of the last paragraph in the Notes on Use wherein it states that whether present Instruction 34.02 is given is at the discretion of the trial judge, but that whether Instruction 34.03 is given is at the defendant's op-

tion. That means, necessarily, that the instruction must be given if requested.

■ SHC argues that there was no evidence of general benefits in this case and hence no basis for the instruction even if it is mandatory that the court give it where there is evidence of general benefits. We disagree with the conclusion of SHC that there was no evidence of general benefits in this case (as will appear from subsequent portions of this opinion), but even if there had been no such evidence, the instruction still should have been given. The second sentence of the first paragraph of the Notes on Use so states and this court has so held. State ex rel. State Highway Commission v. Sams, 484 S.W.2d 276 (Mo.1972).

Even though our decision to reverse and remand based on refusal of Instruction B could dispose of this appeal, without consideration of any of the other alleged errors asserted by defendants, we conclude that certain of the other issues raised necessarily will arise again on retrial and we should resolve them for that reason.

The first such question concerns admissibility of Mr. O'Flaherty's testimony with reference to fair market value before and after taking. Defendants, citing cases such as Shelby County R–IV School District v. Herman, 392 S.W.2d 609 (Mo. 1965), assert that evidence of value is inadmissible if based on impermissible elements or on improper foundation, and that O'Flaherty's testimony should have been excluded on both grounds.

In the first place, it is claimed that O'Flaherty, in determining fair market value after the taking, took into consideration factors which constituted general rather than special benefits. This, say defendants, is contrary to the well established rule in Missouri that only special benefits are offset against damages from the condemnation in arriving at the sum to be awarded for the taking. Such a rule is expressed in State ex rel. State Highway Commission v.

Jones, 321 Mo. 1154, 15 S.W.2d 338, 340 (Mo. banc 1929), as follows:

" 'General benefits,' those accruing to the owners of property in a neighborhood or vicinity generally, are not deductible from the damages; to make such a deduction would be to require the landowner whose property is taken in part to liquidate his damages by contributing his share of the benefits which inure to the public as a whole. 'Special benefits' stand on a different footing; they are such as accrue directly and proximately to the particular land remaining by reason of the construction of the public work on the part taken. Such benefits must, of course, be reflected in an increase in the market value of the land.

"While there is often a contrariety of opinion as to whether the benefits in specific instances are general or special, the general distinction is well understood. 'A general benefit is an advantage not peculiar to the remainder of a tract part of which is taken, but conferred by the public work upon all property within range of its utility.' Randolph, Em.Dom. § 269, p. 250. It is also well settled that a benefit, though conferred upon several tracts of land similarly situated, may nevertheless be a special and not a general benefit."

The rule is elaborated upon in an excellent statement in State ex rel. State Highway Commission v. Young, 324 Mo. 277, 23 S.W.2d 130, 134–135 (1929), as follows:

" * * * Granting there may be exceptions in unusual circumstances, it is not true ordinarily, at least, that if a tract receive benefits substantially greater in degree than those of the same nature accruing to other land in the community, the excess benefits thereby become special—in which event alone they may be offset against damages in a condemnation proceeding. As expressed in appreciation of market value, general benefits, themselves, may differ in amount or degree varying with the tract, its remoteness from the improvement, intrinsic character, etc. All the land in the community may not—almost certainly will not—receive the same general benefits in a monetary sense; and the general benefits derived by the particular tract in litigation might be greater than those enjoyed by any other land, and would be reflected in its increased value. But only that part of the increase resulting from special benefits—those, if any, arising from the land's position directly on the highway improvement, such as availability for new or better uses, facilities for ingress and egress, improved drainage, sanitation, flood protection, and the like— would be chargeable.

"The ultimate question in a case like this does not involve a determination of the amount of benefits in dollars and cents enjoyed by the land involved as compared with *other* lands in the community. * * * The true inquiry is how much of the augmented market value of the *particular* tract is attributable to special benefits. Sometimes it may be helpful, in the solution of this question, to find out how the improvement affects other land in the community not on the highway; but if and when this is so, the facts are of value only as evidence on the main issue. While the distinction is sometimes hard to draw, the rule in this state in the ordinary case is that special benefits are to be differentiated from general benefits by their nature or kind rather than by the amount or degree."

The parties stipulated that the highest and best use for Development's property both before and after the condemnation was industrial development. O'Flaherty did not claim otherwise. As a matter of fact, his testimony was in accord with that stipulation because he specifically stated that the construction of the new highway and the new interchange would not mean shopping centers, motels, restaurants, commercial development, or office buildings on Development's property. It continued to be property adaptable for industrial development.

In addition, O'Flaherty did not claim any benefits such as improved drainage, sanita-

tion or flood protection resulting from the taking. Nor did he testify that there was any change in the actual means of direct ingress and egress to and from Development's remaining property. It was conceded that there was no direct entrance from new I–435 to Development's property, nor was there any access from the diamond interchange directly onto any part of Development's property. Access into and from Development's property had been and continued to be via Front Street, which ran through Development's property located in Tract 2.

O'Flaherty based his claim of increased value to Development's property entirely on the fact of construction of the diamond interchange with Front Street wholly on property condemned from Development and on the proximity of Development's land to I–435 after the new construction. For example, he testified that "this opens up a whole new avenue of possible sales of property in this district because those people that are interested in getting to the interstate system are going to want to locate in this area." Subsequently, he said that property in this area would start to develop immediately because "[i]t's put a roadway in that was not there before, and that a prospective buyer for something down there is going to be again attracted to the location because of the immediate accessibility to the interestate route." Additionally, Mr. O'Flaherty said in response to a question as to whether he also placed an increase in value on increased traffic flow, "My answer is not based on traffic flow. If you mean the traffic that is going to cross that viaduct, that isn't what I am saying. I am saying that this interstate route will open up this area and provide a means of direct access to the people who buy land in here and to get to any connection that we have around here to an interstate route."

■ In the foregoing statements O'Flaherty was talking about general, not special benefits. He was saying that after the construction of I–435 through this area and after completion of the diamond inter-

change between I–435 and Front Street, businesses located in that area could get onto the interstate system quickly, whereas they could not do that before the new I–435 and interchange were constructed, and that this was an advantage which would increase value of the property. Obviously, this feature would make property located in that area attractive to firms interested in transportation via the interstate system. However, those advantages were not limited to property out of which the interchange was carved, but would apply as well to property generally in that area. There were a number of other owners of property located on Front Street and on streets connecting with Front Street. They had identically the same ingress and egress to I–435 via the diamond interchange as did Development. All of them entered and exited from their property on Front Street (or connecting street) and then traveled on Front Street to the interchange and thence to I–435. The slight difference in distance to be traveled on Front Street did not change the benefit to Development from a general to a special benefit. This was implicit in the statement in State ex rel. State Highway Commission v. Young, supra, 23 S.W.2d l. c. 134–135, that: "As expressed in appreciation of market value, general benefits, themselves, may differ in amount or degree varying with the tract, its remoteness from the improvement, intrinsic character, etc. All the land in the community may not—almost certainly will not—receive the same general benefits in a monetary sense * * *. But only that part of the increase resulting from special benefits * * * would be chargeable." Also pertinent is what this court said in State ex rel. State Highway Commission v. Vorhof-Duenke Company, 366 S.W.2d 329, 340 (Mo. banc 1963): "Furthermore, the ramps and roadways in question were not and could not be constructed for the exclusive benefit of the defendants; they were for the use of the general public, including the users of the Halls Ferry Roads, whether nearby or remote from the interchange."

■ An interchange which merely changes the flow of traffic in that it provides new access from an existing street or road onto a highway but which does not provide a separate direct access onto a defendant's property does not constitute a separate benefit to the property from which the right-of-way was condemned unless it causes that defendant's property to become available for new and more remunerative uses or provides other special benefits such as improved drainage, sanitation or flood protection. If such special benefits result, then they should be deducted from other damages incurred by the landowner, and this is true even though the construction of the interchange will benefit all property in the area by improving the means of access to the highway. This is what the court meant in State ex rel. State Highway Commission v. Young, supra, 23 S.W.2d l. c. 135, when it said that " * * * special benefits are to be differentiated from general benefits by their nature or kind rather than by the amount or degree."

■ Since O'Flaherty testified to no special benefits such as new or better uses, improved drainage, sanitation, flood protection and the like resulting from the construction of the interchange, the improved access to and from the interstate system which Development's property enjoyed along with other property in the area constituted general rather than special benefits, and this is true even if the general benefits might not have a uniform effect on value of all tracts in the area.

On retrial, witnesses for SHC would be entitled to testify as to any special benefits which qualify as such under what we have said herein or in other cases decided by this court, but evidence of general benefits such as those to which we have referred should not be received in evidence, and such benefits should not be considered by witnesses in testifying as to damages suffered as a result of the condemnation.

The second question raised by defendants with reference to the testimony of Mr. O'Flaherty relates to the basis upon which he arrived at fair market value of the affected property. In his testimony, Mr. O'Flaherty recognized that Missouri courts have sanctioned three normal methods or bases for arriving at fair market value. They are comparable sales, cost of replacement and capitalization of income.

■ "Comparable sales" consist of evidence of sales reasonably proximate in time and distance and involving land comparable in character. State v. Koberna, 396 S.W.2d 654 (Mo.1965); State ex rel. State Highway Commission v. Riss, 432 S.W.2d 193 (Mo.1968). This was the method used by Mr. McMahon, who testified on behalf of the defendants. The "cost of replacement method" is commonly utilized to value improved property and takes into consideration cost necessary to replace the existing structure. This land was unimproved and therefore this method was not appropriate. The "Capitalization of income method" is utilized to value income producing property when completely taken. Land Clearance for Redevelopment Authority of the City of St. Louis v. Morrison, 457 S.W.2d 185 (Mo. banc 1970); Shelby County R–IV School District v. Herman, supra. This method also was not appropriate since this was unimproved property and there was no income therefrom. In addition, the whole property was not taken.

O'Flaherty did not use any of the foregoing methods. Instead, he utilized what he said was not strictly a capitalization of income method but rather a cost of development approach, as heretofore described. SHC argues that this approach was proper because this property was of such unique character that it had no fair market value in the usual sense. SHC analogizes the situation to the ones dealt with by this court in the cases of State ex rel. State Highway Commission v. Barbeau, 397 S.W. 2d 561 (Mo.1965); State ex rel. State Highway Commission v. Mount Moriah Cemetery Assn., 434 S.W.2d 470 (Mo. 1968); and City of St. Louis v. Union

Quarry & Const. Co., 394 S.W.2d 300 (Mo.1965). The Barbeau and Mount Moriah Cemetery Association cases dealt with condemnation of cemetery land for highway purposes. The court concluded that the property taken had no market value in the ordinary sense, that it was available for and adaptable to no other use than cemetery purposes, and that it was appropriate under those circumstances to adopt a unique and different approach for the purpose of determining the fair market value of the property taken. The Union Quarry case was of a similar nature except instead of capitalizing sales of grave sites, the parties capitalized income based on the capacity of the quarry as a refuse dump. However, those cases are inapplicable here. In Barbeau, for example, the court found that the land was being devoted to the only apparent use to which it would be most advantageously and properly applied. Additionally, in Barbeau, only burial rights were being sold, and in Union Quarry dumping rights were being sold. Hence, the sale of rights in both cases was an income return on investment, not a sale of the capital asset itself, as here.

■ This court did not in any of these cases grant carte blanche for use of this method generally. It is not available in a case such as the one here presented where the evidence clearly demonstrates that the use for which the tract is adapted is not unique. Nor is the difference in size of tracts sold (and others of which O'Flaherty had knowledge) and the size of the industrial tract a basis for not using the comparative sales approach. State ex rel. State Highway Commission v. Riss, supra. Particularly is this true where there is evidence that there have been a substantial number of sales out of this property, and where no reason is shown why the property cannot be valued on the basis of such comparable sales. As previously noted, there was evidence of 28 separate sales to 26 different companies before this condemnation proceeding was filed, and the number of sales had increased to 35 by trial

time. McMahon had no trouble in utilizing the comparable sales method, and we see no reason why it should not be usable by witnesses for SHC.

The next issue raised on appeal which we must assume necessarily will arise on retrial concerns the exclusion of testimony offered by defendants concerning consequential damages to portions of Tracts 2A and 2B resulting from inability to lay additional tracks by reason of the narrow bridge opening over the Hawthorne Lead Branch.

The record discloses that on June 30, 1966, SHC, pursuant to § 389.640, applied to the Missouri Public Service Commission for approval of the I-435 overpass and single track grade separation located where the new highway was to cross over the Hawthorne Lead Branch. KCS appeared at the PSC hearing and argued, as it had earlier with SHC, for approval of a grade separation plan which would permit construction of four additional tracks. SHC opposed that suggestion on the basis that no need existed for additional tracks at that time, that the Federal Bureau of Roads probably would not approve such a plan, and that if defendants were damaged by the structure proposed by SHC, their remedy was to seek compensation in the condemnation action. The PSC denied the request of KCS and approved the single track plan. Defendants took no appeal therefrom, deciding, as SHC had alleged to be appropriate in the hearing before the PSC, to seek damages in the condemnation proceeding.

On March 1, 1971, which was after I-435 (including the bridge, piers and fills at the Hawthorne Lead Branch) had been constructed according to the original plans, SHC amended its petition in condemnation with reference to the paragraphs relating to the Hawthorne Lead Branch grade separation. The amendment consisted of adding to the paragraphs relating to the Hawthorne Lead Branch grade separation the following: " * * * and it is further

reserved and excepted to defendant * * * the right to construct and maintain tracks as they may deem proper across the right-of-way described in Paragraphs 10.10 and 10.11 hereof." On this appeal, SHC explains that amendment by saying, "The only reason we filed the amendment was to clarify the position that *as far as plaintiff is concerned*, defendants are at liberty to put in more tracks if they can get an order of approval from the Missouri Public Service Commission. The costs will be apportioned."

Defendants filed a motion to strike this amendment by SHC. The trial court overruled that motion, holding that the amendment merely clarified what SHC had intended all along to take and use. The court order stated further that if a different conclusion should be reached on appeal, the court was holding as a matter of law that this amendment reserved to defendants substantial additional rights which lessened the taking by SHC and lessened the damages to defendants' property. On the basis of this amendment, the court denied to defendants the right to prove damages of $173,500 to Tract 2A and $61,500 to Tract 2B resulting from the restricted rail access.

When the trial court refused to permit proof of such decreased value on account of SHC's amendment to its petition, defendants sought to offer proof that it would cost $435,210 to change the I-435 bridge at the Hawthorne Lead Branch so as to permit placement of four additional rail lines. It was defendants' position that by reason of the great expense involved in making such a change, the amendment to the condemnation petition actually conferred nothing of value on defendants. The trial court rejected this offer of proof.

In State ex rel. State Highway Commission v. Stotko, 365 S.W.2d 64 (Mo.App. 1963), the appellate court reversed a decision of the trial court wherein it had denied plaintiff permission to amend its peti-

tion before trial whereby it reserved to the defendant landowner the right to install and maintain water mains across a previously condemned right-of-way upon which Highway 44 had already been constructed. Defendants were alleging severance damages by reason of the fact that the highway bisected their properties and precluded use of a previously existing right to establish water mains across the entirety of the tract. In reviewing the action of the trial court in denying said amendment the appellate court held that to affect the fixing of damages, the amendment must in fact reduce the extent of the appropriation and confer something of value on defendants. This question of whether there is an actual reduction in appropriation, the court held, is susceptible to expert opinion. The court concluded that experts might decide that construction of water mains across the right-of-way at that stage of development was impossible, or that the cost thereof would be so prohibitive as to render the amendment worthless. On remand the court was to hear expert testimony on this question and then decide the issue before submitting the case to the jury.

■ SHC undertakes to distinguish this case from Stotko on the basis that whereas in Stotko the ability of the owner to build additional water mains was affected as a direct result of the action by SHC in constructing the highway, here the restriction in size of the opening for the Hawthorne Lead Branch was the result of action by the Missouri PSC, rather than SHC. Hence, says SHC, damage resulting from size of the bridge was caused by the PSC, not SHC. Such contention overlooks the fact that both the construction of the highway and the involvement of the PSC therein all flowed from the action of SHC in bringing the condemnation suit. The PSC does not condemn land nor construct highways. It only approves grade separations pursuant to statutory mandate. The fact that the action of the SHC in constructing the highway is subject to this

limitation of requiring approval by the PSC or that SHC must conform to requirements imposed by the Bureau of Public Roads is not a basis for depriving a landowner of compensation for damage shown to result from the condemnation proceeding and the resultant construction. Whatever damage defendants suffered by reason of limitation of rail access by the size of the Hawthorne Lead Branch bridge was caused by the condemnation by SHC.

Since this case must be remanded for new trial anyway, the court will have an opportunity, as directed in Stotko, to receive expert testimony and determine whether a change to allow construction of four additional lines is realistically possible, and if so, what the cost would be, and whether or not it is so great as to make the amendment worthless to defendants, as they claimed at the previous trial.

There is present in this case an additional factor, not present in Stotko, which affects the value of the amendment made by SHC. This involves the question of whether the Missouri PSC would approve and authorize a change in the Hawthorne Lead Branch grade separation. It appears likely, however, that such question may soon be resolved, if it has not already been settled. SHC, in its brief before this court, went outside of the record on appeal to point out that after this trial, KCS, in February, 1972, applied to the PSC for approval of a change in the grade separation at the Hawthorne Lead Branch bridge to permit room for construction of additional lines of railroad track. SHC referred to this development in response to argument in the brief of defendants that any rights granted by the amendment to the condemnation petition were of no value. If that be true, argued SHC, why did KCS file the application for approval in 1972?

In response thereto, defendants in their reply brief called attention to the answer filed by SHC to that application and to the fact that although SHC had argued in the trial court, as well as on appeal, that the amendment gave defendants the right to construct additional lines if they could persuade the PSC to approve, it had actively opposed the granting of such approval by the PSC. SHC's answer recited that subsequent to prior PSC approval of the grade separation based on a single railroad track, SHC had condemned the right-of-way and had constructed the highway; that modification as sought by the defendants could be accomplished only at prohibitive expense, which would exceed the original cost of the structures built; and that such change would inconvenience the public, jeopardize public safety, and would serve only private interests. Hence, SHC sought to prevent utilization by defendants of the right which allegedly eliminated any claim for damages resulting from limitation of rail access.

If, prior to retrial, the PSC has denied permission to defendants to alter the grade separation and construct additional tracks, then obviously the amendment has not given defendants additional rights of any value, and the amendment should not deny to defendants the opportunity to prove damage to portions of Tracts 2A and 2B by reason of the restricted rail access via the grade separation at the Hawthorne Lead Branch. If, on the other hand, permission has been granted to make the change, then the trial court can consider what apportionment of costs has been directed and determine therefrom the extent, if any, to which damage to defendants has been diminished by reason of the amendment of March 1, 1971.

The final question which we should consider and settle for purposes of retrial involves the propriety of the trial court's ruling that the railroad right-of-way conveyance (Defendants' Exhibit 12) granted a right to build roads as well as install railroad tracks, and that for this reason testimony as to damage to Tract 2A east of I-435 because it was landlocked should be excluded.

At the trial, witness McMahon testified that construction of I–435 had caused that portion of Tract 2A east of the new highway to be completely landlocked insofar as vehicular traffic was concerned because the new highway made impossible the extension of streets and roadways into that tract as previously planned. He pointed out that the tract was now completely surrounded by the Missouri River, a tract belonging to Kansas City Power & Light Company, the Rock Island right-of-way, and new I–435. On the basis that the tract was now cut off from vehicular traffic, he testified that the value was decreased $500 per acre or a total of $173,500.

SHC took the position that railroad right-of-way easements theretofore granted by Kansas City Power & Light Company to KCS gave to the latter the right to construct roads as well as railroad tracks across the Kansas City Power & Light Company property and that this right of access meant that the tract was not landlocked as to vehicular traffic. The trial court so construed the railroad right-of-way conveyance and required McMahon to reduce his damage estimate by said sum of $173,500.

The conveyance in question described five strips across the Kansas City Power & Light Company property over which railroad easements were granted to KCS. These strips made it possible for KCS to run spur tracks from its Hawthorne Lead Branch into various portions of the 346 acres in that portion of Tract 2A lying east of I–435. The said right-of-way conveyance recited that it granted "a right-of-way for railroad purposes" over the five strips in question, and further provided that, "The Grantee, its successors and assigns, shall have the right to survey, erect, construct, maintain, inspect, patrol, rebuild and repair railroad tracks and appurtenances thereto, together with the right to replace, renew and relocate rails, ties, switches, signaling equipment and other facilities and appurtenances and generally to conduct railroad operations upon, across, over and along said right-of-way."

In holding that the right-of-way conveyance included the right to construct roads, the trial court held as follows:

"The court further rules as a matter of law that the instrument designated Defendants' Exhibit 12 in referring to appurtenances thereto, the court interprets the word 'appurtenances' to mean as an incident to running the railroad track across the 35-foot easement, which the court understands takes a width of approximately 14 feet for a railroad track, that the grantee, rather, Kansas City Southern Railway Company has the right to run a road across Parcels, 1, 2, 3, 4, and 5."

<span style="background-color:black;color:black"></span> We conclude that the foregoing easements were for railroad purposes, which gave a right to construct and maintain railroad tracks, including necessary appurtenances thereto, but which did not include a right to construct a road or street for purposes of general transportation by trucks and cars in and out of the 346 acre industrial tract. We are not talking about whether the railroad would have the right to make provision on the right-of-way for such vehicular traffic as might be necessary to install, maintain or repair the railroad tracks and pertinent facilities. Rather, we are talking about whether it was intended that this conveyance granted to KCS the right to construct roads for general vehicular traffic into and out of the 346 acre tract for the purpose of serving industries and businesses located therein. There is no language in the easement which indicates any intention of the parties to provide for such roads or streets. All of the language relates to the fact that it is intended to convey only a right to install and operate railroad tracks and necessary appurtenances in connection therewith.

The language appearing in 25 Am.Jur.2d, Easements and Licenses, § 86, is pertinent. It is there stated:

"In order that the owner of an easement may perform the duty of keeping it in re-

pair, he has the right to enter the servient estate at all reasonable times to effect the necessary repairs and maintenance, or even to make original constructions necessary for enjoyment of the easement. Such right is an incident of the easement, and is sometimes called a 'secondary easement.' Such secondary easements can be exercised only when necessary, and in such a reasonable manner as not to increase needlessly the burden on * * * the servient estate."

The secondary easement referred to therein would permit KCS to utilize the right-of-way insofar as necessary to repair and maintain, as well as to originally construct the railroad tracks, but would not permit a burden in the form of a primary roadway for the purpose of serving general vehicular traffic.

The trial court's ruling concluded that "appurtenance" would include the right to construct such a road, but we disagree. Language used by the court in Guaranty Trust Co. v. Minneapolis & St. L. R. Co., 33 F.2d 512, 519 (D.C.Minn.1928), is relevant:

" * * * the word 'appurtenance,' when used in connection with a line of railway, is used to describe something akin to the line of railway; e. g., a spur, a siding, a switchyard, a branch, an extension. That the word 'appurtenances' was used in paragraph 18 with this latter meaning would seem clear from the clause at the end of the paragraph, which expressly provides that branches or extensions constructed or acquired after the date of the mortgage are not intended to be covered. This provision leads to the inference that the word 'appurtenances' had reference to spur, sidings, etc., rather than rolling stock."

On retrial, the defendants should be permitted to offer evidence as to damage to Tract 2A east of I–435 on the basis that construction of the highway resulted in landlocking the tract insofar as vehicular traffic is concerned.

Reversed and remanded.

All of the Judges concur.