**STATE of Missouri ex rel. MISSOURI HIGHWAY AND TRANSPORTATION COMMISSION, Plaintiff–Appellant,**

v.

**MODERN TRACTOR AND SUPPLY COMPANY, Defendant– Respondent.**

**No. 17620.**

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 20, 1992.

Motion for Rehearing or Transfer to Supreme Court Denied Sept. 9, 1992.

Application to Transfer Denied
Oct. 27, 1992.

Judy L. Curran, Dist. Counsel, Kansas City, Zachary Cartwright, Dist. Counsel, Rich Tiemeyer, Chief Counsel, Jefferson City, for plaintiff-appellant State ex rel. Missouri Highway & Transp. Com'n.

Gerald H. Lowther, Michael K. Cully, Lowther, Johnson, Joyner, Lowther, Cully & Housley, Springfield, for defendant-respondent Modern Tractor and Supply Co.

MAUS, Judge.

By this action the Missouri Highway and Transportation Commission (Commission), exercising the power of eminent domain, acquired an easement for the construction of the James River Freeway through Kickapoo Prairie Farm owned by Modern Tractor and Supply Company (Modern Tractor). The farm contained 272.78 acres. The right-of-way contains 34.78 acres. A jury found Modern Tractor's damages to be $940,000.00. On its appeal, the Commission's principal assertions of trial court error stem from the admission of expert opin-

ions valuing the farm rezoned as a Planned Unit Development (PUD) containing commercial, multi-family residential and single-family residential property. The following is an outline of the evidence necessary to provide a background for consideration of the dispositive issues.

Kickapoo Prairie Farm is located near the southwest corner of Springfield. The east 84.44 acres were in Springfield. The west 188.34 acres were west of the city limits. The farm was bordered on the east by Kansas Expressway, a limited access four-lane roadway. It was bordered on the south by Greene County Highway M, also known as "Republic Road". It was bordered on the west by Scenic Avenue and a residential subdivision. It was bordered on the north by vacant land.

Basically, Kickapoo Prairie Farm consists of three 40-acre tracts east and west by three 40-acre tracts north and south, excepting the 40-acre tract at the northwest corner and 14 acres in the form of a rectangle from the southeast corner. The east six 40-acre tracts were bisected by a north-south road, known as "Cox Road". James River Freeway extends in an east-west direction through the approximate center of the south six 40-acre tracts. Of Kickapoo Prairie Farm, 143 acres remain north of James River Freeway and 95 acres remain on the south side of James River Freeway.

James River Freeway is a limited access divided four-lane roadway extending in a general east-west direction. It will eventually connect U.S. 65 on the east with U.S. 60 on the west. In doing so, it extends across the southern part of Springfield. There will be a diamond interchange at the intersection of Kansas Expressway and the divided highway of James River Freeway. The appropriation for James River Freeway also included the right-of-way for what is termed the "Cox Road Connector". The Cox Road Connector extends in a westerly direction from Kansas Expressway to provide ingress to and egress from Cox Road. The Cox Road Connector right-of-way is located approximately 150 feet north of the right-of-way for the north ramp from Kan-

sas Expressway to James River Freeway. From Kansas Expressway, the Cox Road Connector runs parallel to that ramp for approximately 1,000 feet and then curves to the north and connects with the existing right-of-way of Cox Road. Cox Road is bisected by James River Freeway.

The date of taking was September 3, 1985. Kickapoo Prairie Farm was improved with a barn and other unidentified buildings. It was used primarily for pasture. It was subject to a three-year farm lease dated March or April 1985. The east 84.44 acres in the City of Springfield were zoned "R-1", single-family residential. The west 188.34 acres, under the zoning regulations of Greene County, were zoned "A-1", agricultural.

Modern Tractor presented the testimony of Claude Eugene Boles, Jr. Boles had served as Community Development Director for Springfield from 1979 to 1985. At the time of trial, he was a land planning consultant. He was accepted as an expert on zoning and planning. The ordinances of the City of Springfield governing zoning were not introduced in evidence. Apparently they provide for the zoning and development of a Planned Unit Development. The testimony was that such ordinances provide a mechanism whereby a landowner can devise a plan for zoning different portions of a sizeable tract for different uses. The ordinances outline the various steps needed for the approval of such a plan and its adoption as part of the zoning regulations of the City of Springfield. The required steps include a preliminary conference, submission to and approval or disapproval by the Planning and Zoning Commission. The last step is the final approval of a Planned Unit Development by the adoption of an ordinance by the City Council.

The Southwest Springfield Development Plan (Plan) was introduced into evidence. See § 89.340 RSMo. The purpose and scope of that Plan is outlined by the following excerpts from the Resolution of the Planning and Zoning Commission adopting the Plan.

"WHEREAS, the Planning and Zoning Commission, by state statute and Section 11.2 of the City Charter has the authority and the responsibility to develop a master plan for the development of the City of Springfield, and;

WHEREAS, Section 11.5 of the City Charter provides that the master plan for the physical development of the City, with the accompanying maps, charts, descriptive and explanatory matter shall show the Commission's recommendations for the development of city territory, and;

WHEREAS, Section 11.6 of the City Charter provides that the Commission may adopt the master plan for the development of the city as a whole by a single resolution, or may by successive resolutions adopt successive parts of the plan, said parts corresponding to major geographical sections of the city or to functional divisions of the subject matter of the plan, and may adopt any amendment or extension thereof or addition thereof, and;

\*　　\*　　\*　　\*　　\*　　\*

NOW, THEREFORE, BE IT RESOLVED, that the Planning and Zoning Commission hereby adopts and recommends to Council for adoption Exhibit A attached hereto and incorporated herein by this reference thereto as the Southwest Springfield Development Plan Element of the Master Plan for the development of the City of Springfield, Missouri."

By ordinance, the City Council adopted the Plan "as an element of the Master Plan for the development of the City of Springfield, Missouri", on June 25, 1984.

The Plan is a detailed document of 271 pages which sets forth various goals and standards, an Overall Development Scheme, and Specific Policy Applications. It encompasses an L-shaped study area containing about 11 square miles. Two-thirds of the study area is in Springfield and one-third outside Springfield. The west boundary of the area is Golden Street and the area includes the whole of Kickapoo Prairie Farm. The section of Specific

Policy Applications is based upon a plat of the area which is divided into subareas. Kickapoo Prairie Farm is in Tracts 2 and 6 in subarea 8. The plat of the study area and subarea 8 includes the right-of-way for James River Freeway.

Boles testified the highest and best use of Kickapoo Prairie Farm before the taking was as a PUD. Boles prepared three maps or plats of the farm as a PUD disregarding the James River Freeway. They were designated Schemes "A" "B" and "C". Each was a sizeable exhibit, admitted in evidence and shown to the jury. Each plat provided for streets to serve the PUD. Each plat had areas designated as residential (low density), residential (medium density), office/multi-family (high density) and commercial/office. The areas were separated by distinct boundaries, in many cases by streets, and they were distinguished by color. In general, the plats were similar. Scheme B provided for a greater area of office/multi-family (high density) than would Scheme A. Scheme C provided for the following number of acres designated for the following uses:

| Use | Acres |
|---|---|
| Residential (low density) | 65.8 |
| Residential (medium density) | 37.7 |
| Office/Multi-family　　(high density) | 65.3 |
| Commercial/Office | 104.2 |

Boles anticipated that for Scheme C to receive favorable consideration, the developer would be required to spend $755,000.00 in "off-site" improvements such as upgrading adjoining Highway M, upgrading Scenic Street and signals at major intersections. The development of the farm to accommodate Scheme C would require "off-site" and "on-site" improvements costing $3,000,000.00. In Boles' opinion, Schemes A and B were consistent with the Southwest Springfield Development Plan and Scheme C was not. Nevertheless, in Boles' opinion, it was reasonably foreseeable that Kickapoo Prairie Farm would be rezoned to accommodate Scheme C.

Boles also prepared the Land–Use–Plan for Kickapoo Prairie Farm as a PUD after the appropriation. This plan designated

the following uses for the following number of acres:

| Use | Acres |
|---|---|
| Single-family | 77.6 |
| Multi-family | 26.4 |
| Medium Density | 30 |
| Office/Multi-family | 19.5 |
| Office/Multi-family/Commercial | 94.4 |
| Office/Multi-family/Limited Commercial | 15.7 |
| Commercial/Office | 19.4 |

In Boles' opinion, the portion of Kickapoo Prairie Farm not in the right-of-way could have been rezoned to accommodate the Land–Use–Plan. Boles did not testify as to the value of Kickapoo Prairie Farm either before or after the taking.

Modern Tractor presented five witnesses who were accepted as qualified real estate appraisers in respect to the valuation of Kickapoo Prairie Farm. They were: Loy Scroggins, Robert Leonard, Dorrell Hanks, Don Akers and Maurice Burlison. With the exceptions hereafter noted, the testimony of those five appraisers followed the same general pattern. Each was of the opinion that the highest and best use of Kickapoo Prairie Farm was as a Planned Unit Development. None of those five appraisers prepared a plat or a design of the farm as a Planned Unit Development. Each conceived of it as a Planned Unit Development by assigning a percentage of the farm to each of the categories of single family, multi-family and commercial use. In the opinion of Scroggins, Leonard, Akers and Burlison, the appropriate PUD would designate 70% of the property at single-family use, 15% as multi-family and 15% as commercial. Hanks would designate 65% single-family, 15% multi-family and 20% commercial. Each testified it was reasonably foreseeable Kickapoo Prairie Farm would be rezoned in accordance with the Planned Unit Development conceived of by each witness. Then by the "comparable sales" method, each of the five experts determined that the reasonable market value of each acre in the percentage of Kickapoo Prairie Farm designated in each category to be as follows:

| Name | Commercial Acre | Multi–Family Acre | Single–Family Acre |
|---|---|---|---|
| Scroggins | $64,000 | $42,000 | $9,200 |
| Leonard | $87,120 | $43,560 | $9,000 |
| Hanks | $60,000 | $41,000 | $8,500 |
| Akers | $87,000 | $44,000 | $9,000 |
| Burlison | $87,120 | $43,560 | $9,000 |

Each appraiser arrived at his opinion of the value of the farm before the taking by the following calculation. The number of acres in each category was determined by multiplying 272.78 by the percentage each appraiser assigned to each of the three categories. The number of acres in each category was multiplied by the value of an acre in that category. The result was the value of the percentage of the farm assigned to the category. The three figures representing the entire farm were totalled. The result was the appraiser's opinion of the value of the farm before the taking.

To determine the value of the farm after the taking, each appraiser first determined the value of an average acre by dividing his opinion of the value of the farm by 272.78 (the number of acres in the farm). The appraiser then multiplied 34.78 (the number of acres taken) by his calculated figure of the value of an average acre. The result was subtracted from his opinion of the before value. The difference was the appraiser's opinion of the value of the farm after the taking. Those opinions and calculations of value of the appraisers were as follows:

| Name | Value Before | Value After Taking | Damages |
|------|--------------|--------------------|---------| 
| Scroggins | $6,101,176 | $5,323,252 | $777,924 |
| Leonard | $7,074,360 | $6,174,360 | $904,280 |
| Hanks | $6,457,360 | $5,622,640 | $834,720 |
| Akers | $7,088,020 | $6,184,296 | $903,723 |
| Burlison | $7,069,980 | $6,165,700 | $904,280 |

After each appraiser had testified in the foregoing fashion concerning his own opinion of the highest and best use of Kickapoo Prairie Farm, its value before the taking and its value after the taking, as set forth above, he was further examined upon the basis of Boles' Scheme C. While the exact form of the questions varied, in general each appraiser was shown the plat of Scheme C and asked to assume Boles had testified that Scheme C was the highest and best use of Kickapoo Prairie Farm and that it was reasonably foreseeable the land would be rezoned as designated on the plat of Scheme C. Each appraiser was then asked to calculate the value of Kickapoo Prairie Farm before the taking on the basis of Scheme C. Each appraiser complied by using the value of an acre of commercial, multi-family and single-family land that he had previously testified to and multiplying by the number of acres in each category shown on the plat of Scheme C. Using the same per-acre method of calculation, the appraisers testified that upon the basis of Scheme C, the value of Kickapoo Prairie Farm before the taking would be as hereafter set forth in the chart below.

Each appraiser was then presented with the plat of Boles' Land-Use-Plan for Kickapoo Prairie Farm after the taking. Each appraiser was asked to calculate the value of the Kickapoo Prairie Farm after the taking upon the basis of Boles' Land-Use-Plan. The values determined in the same fashion are as hereafter set forth:

| Name | Boles' Scheme "C" Value Before | Boles' Land-Use-Plan Value After | Damages |
|------|--------------------------------|----------------------------------|---------|
| Scroggins | $10,845,160 | $ 8,628,600 | $2,216,560 |
| Leonard | $13,401,784 | $10,617,844 | $2,783,940 |
| Hanks | $10,279,300 | $ 8,169,500 | $2,109,800 |
| Akers | $13,434,600 | $10,645,000 | $2,789,600 |
| Burlison | $13,401,784 | $10,617,760 | $2,784,024 |

The Commission presented the testimony of the current Director of Community Development of the City of Springfield. In his opinion, the land use proposed by Scheme C did not coincide with the guidelines of the Plan for rezoning. He would recommend only 30 acres as commercial. The Commission also presented the testimony of two appraisers who were accepted as experts in valuing Kickapoo Prairie Farm. Each found that Kickapoo Prairie Farm derived special benefits from James River Freeway by reason of the location of the farm at the northwest quadrant of the intersection of the Freeway and Kansas Expressway and the construction of Cox Road Connector. In their opinion, by reason of special benefits resulting from James River Freeway, the taking did not result in damages. As stated, the jury rendered a verdict of $940,000.00.

The Commission contends that for a number of reasons the trial court erred in admitting and refusing to strike the valuation testimony of each of the five appraisers presented by Modern Tractor. This contention is directed at the testimony of the appraisers' own opinions of values and

damages. It is also directed at those appraisers' testimony of values and damages based upon Boles' Scheme C and Land–Use–Plan.

The basic legal principles governing the valuation of real estate and calculation of damages in eminent domain proceedings by expert opinion are well established. Those principles applicable to a partial taking include the following. " 'When part of a tract of land is condemned, the appropriate measure of damage is the difference between the fair market value of the entire property before the taking and the fair market value after the taking.' *Missouri Highway & Transportation Commission v. Horine*, 776 S.W.2d 6, 12 (Mo. banc 1989)." *State ex rel. Missouri Highway and Transportation Commission v. Sturmfels Farm Ltd. Partnership*, 795 S.W.2d 581, 585 (Mo.App.1990). The damages are not to be determined by considering only the value of the property taken. Cf. *Union Electric Company v. Saale*, 377 S.W.2d 427 (Mo.1964). An expert opinion of the value of real property must not be based on speculation. "To have probative value expert opinion must be 'founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation.' *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir.1966)." *6816.5 Acres of Land, Etc., Rio Arriba Co., N.M. v. United States*, 411 F.2d 834, 838 (1969). The value to be considered is the "market value" at the time of the taking. However, "[i]n the determination of what constitutes the fair market value the jury may consider uses of the land for which it is reasonably adapted or suited and for which it is *available*, having regard to the existing business wants of the community, or such as may be reasonable [sic] expected in the future." *Union Electric Company v. Saale*, 377 S.W.2d at 429. (Emphasis in original.) "This * * * means only that the fact of the property's capability or adaptability to the use may be considered as an element of its present value. Mere speculative uses cannot be considered. There must be some probability that the land would be used within a reasonable time for the particular use to

which it is adapted." *Union Electric Company of Missouri v. McNulty*, 344 S.W.2d 37, 40 (Mo.1961). (Omission in original.) An expert's opinion of value must not be couched in terms that would mislead a jury. *In re Armory Site in Kansas City*, 282 S.W.2d 464 (Mo.1955). An expert opinion of value, based upon a false premise, has no evidentiary value.

" 'The facts upon which an expert's opinion is based, like the facts sufficient to support a verdict, must measure up to the legal requirements of substantiality and probative force; and the question of whether such opinion is based on and supported by sufficient facts or evidence to sustain the same is a question of law for the court.' " *Spain v. Brown*, 811 S.W.2d 417, 423 (Mo.App.1991).

"The potential significant impact on a non-expert jury of expert testimony in the complex field of land appraisal seems to warrant extreme caution in the admission of such testimony." *State ex rel. State Highway Com'n v. Steinlage*, 545 S.W.2d 326, 331 (Mo.App.1976).

The Commission's first contention of error is that the appraisers were erroneously permitted to determine damages by the "capitalization" or "lot" method.

"The appellant charges the defendants' expert witnesses solely utilized the 'lot method' or capitalized development method in appraising the damages caused by the taking of the power line right-of-way. This method assigns value to land as if it was developed (capitalized) and subdivided into saleable lots. See 4 Nichols, Eminent Domain § 12.3142[1][a], p. 12–337 (3d ed. 1985); and is merited only in unique circumstances. *State ex rel. State Highway Commission v. Riss*, 432 S.W.2d 193, 198 (Mo.1968). If the 'lot method' was used to the exclusion of all other methods it would be a violation of the principles enunciated in *In re Armory Site in Kansas City*, 282 S.W.2d 464 (Mo.1955); *State, ex rel. State Highway Commission v. Williamsville Stone Co., Inc.*, 622 S.W.2d 407 (Mo.App. 1981)." *KAMO Elec. Co–Op., Inc. v.*

*Sanders,* 737 S.W.2d 514, 515 (Mo.App. 1987).

The applicable law has been summarized.

"The entire tract may not have a fair market value equal to the total that each lot would later sell for individually. In that instance a buyer would not pay an amount equal to the sum that lots would sell for in the future. He would allow for the time when the sale would occur, expenses and profit. If the appraisers computed the present value solely by determining the number of lots and multiplied that number by the lots' contemplated selling price in the future, it would be erroneous even if the development expenses and other selling expenses were deducted. However, the property's capability or adaptability to a residential use may be considered as an element of its value. *State ex rel. Kansas City Power & Light Co. v. Salmark Home Builders, Inc.,* 375 S.W.2d 92, 99 (Mo. 1964). The accepted rule for the valuation of unimproved land is to consider the land in its present condition as a whole with consideration given to enhancement in value due to the property's adaptability to subdivision development. 4 Nichols, Eminent Domain, § 12.3142[1][a], p. 12–356 (3d ed. 1980)." *State ex rel. State Highway Commission v. Williamsville Stone Company, Inc.,* 622 S.W.2d 407, 409 (Mo.App.1981).

Also see *State ex rel. State Highway Commission v. Riss,* 432 S.W.2d 193 (Mo.1968); *KAMO Elec. Co–Op., Inc. v. Sanders,* supra; Mo. Condemnation Practice, § 5.6 (MoBar 2d ed. 1988). The cases dealing with the "capitalization" or "lot" method establish a subsidiary principle that an unrecorded plat of undeveloped real estate may be admitted to show the adaptability of property for designated uses, but may not be used as the basis for the calculation of damages.

"Such an exhibit can be admitted into evidence to show the feasibility of subdividing ground for residential use. However, the landowner will not be permitted to draw the right-of-way over his proposed subdivision and claim that so many 'paper' lots are going to be taken thereby depriving him of so many dollars per lot. This has been almost universally condemned in every jurisdiction in the United States and the rule is followed in Missouri. See *Arkansas State Highway Commission v. Watkins,* [229 Ark. 27,] 313 S.W.2d 86 (Ark.1958), and *State ex rel. State Highway Commission v. Gann,* 407 S.W.2d 898 (Mo.1966)." Mo. Condemnation Practice, § 6.31 (MoBar 2d ed. 1988).

No case has been cited nor found considering the propriety of using the "lot" method to determine damages to a tract of land devoted to agricultural purposes upon the basis of an unplatted and undeveloped PUD. However, a similar factual situation was involved in *State ex rel. State Highway Commission v. Riss,* supra.

In that case, the landowner sought to establish damages upon the basis of the following argument.

" '... Since there are no comparables for the sale of an entire 680–acre tract of land with a lake thereon, the appropriate way to arrive at the market value is to determine the number of lots of each type which could be developed and sold before the taking, and the number that could be developed and sold after the taking.' " 432 S.W.2d at 198.

The court held: "The value of the tract for residential purposes would undoubtedly be enhanced by the presence of a lake. However, that does not call for a capitalization method of valuation". *Id.* at 198. The court denied the use of the "lot" method upon the basis of *In re Armory Site in Kansas City,* supra.

■ Of course, an expert opinion that agricultural land is adaptable to a PUD is admissible. That opinion may be reinforced by a plat showing how the land could be utilized in a PUD. See 5 *Nichols on Eminent Domain* § 23.07[1] (Rev.3d ed. 1991). However, the determination of damages by multiplying the number of acres designated on a plat for a particular use, such as a commercial use of an undeveloped farm, by the value of an acre zoned for commercial use carries the same mis-

leading connotations condemned in the cases considering the "lot" method. Cf. *State ex rel. State Highway Commission v. Riss,* supra.

■ In this case, the effect was exacerbated by each appraiser's use of his unplatted concept of a PUD to arrive at the value of an average acre (lot) taken and determining damages by multiplying that average value by the number of acres taken. The Commission did not take an average acre. In the opinion of the appraisers, the portion of Kickapoo Prairie Farm most adaptable and valued for commercial use bordered Republic Road and Kansas Expressway. A substantial majority of the acres in the James River Freeway Corridor, even in the unplatted developments envisaged by the appraisers, would be restricted to A–1 and R–1 use. As hereafter more fully discussed, if the mandate of the Southwest Springfield Development Plan were followed, that would certainly be true. The determination of damages by the lot method by multiplying the value of a fictional lot (average acre) by the number of lots (acres) taken was erroneous.

The Commission next contends that because the farm was zoned "A–1 (Agricultural)" and "R–1 (Single-family)" the trial court erred in permitting the appraisers to express a value of an acre as if in fact zoned for commercial or multi-family use. As stated,

"[i]n condemnation cases, damages are properly measured as of the date of the taking, *Western Robidoux P & L Co. v. Missouri Highway Comm.,* 498 S.W.2d 745, 748 (Mo.1973) and see also cases collected in Missouri Digest, Eminent Domain at 124. The approach, however, is not a wholly static one. The notion of highest and best use, and thus some reflection of the potential future development of the property, is provided for in the approved damages instruction for such cases. Thus MAI–Civil 16.02 provides that:

'In determining fair market value you should take into consideration all the uses to which the property may best be applied or for which it is best adapted, under existing conditions and under conditions to be reasonably expected in the near future.' " *State ex rel. State Highway Com'n v. Steinlage,* 545 S.W.2d at 330.

In general, this principle is applicable to real estate, the use of which is restricted by zoning regulations. However, because the potential value of real estate upon a change of zoning regulations is dependent not only upon the demand for such use but also upon the action of governmental agencies, specific rules have developed in regard to the admissibility of testimony concerning a change in zoning regulations. The topic is the subject of an Annotation, *Eminent Domain—Damages—Zoning,* 9 A.L.R.3d 291 (1966), in which the relevant law has been summarized as follows.

"It has been held that while the likelihood of a change in existing zoning restrictions is a relevant consideration in valuing the property being condemned, the existence of an element of uncertainty forbids evaluating the subject property as though rezoning were already an accomplished fact." 9 A.L.R.3d at 325.

Limitations upon the admissibility of testimony concerning rezoning vary from state to state. See Annot., Eminent Domain—Damages—Zoning (III. Consideration of probability of rezoning, §§ 6–11[b]), 9 A.L.R.3d at 309–323.

■ In Missouri, the applicable rule has been succinctly stated.

"Thus, when determining just compensation for condemned property, it is proper to take into account rezoning which was reasonably probable just before or after the taking and which affected the fair market value of the property at either of those times. *See State ex rel. State Highway Commission v. Carlson,* 463 S.W.2d 74, 80 (Mo.App.1970). The property *'must be evaluated under the restrictions of the existing zoning* and consideration given to the impact upon market value of the likelihood of a change in zoning.' *Saale,* 377 S.W.2d at 429. This may be done either by determining the subject property's value as rezoned, minus a discount factor to allow

for the uncertainty that rezoning would actually take place, or by determining the property's value with its existing zoning, plus an incremental factor because of the probability of rezoning. *Carlson,* 463 S.W.2d at 81–82; *See generally Nichols, Eminent Domain* § 12C.03[2].2 (1989)." *State ex rel. Missouri Highway and Transportation Commission v. Sturmfels Farm Ltd. Partnership,* 795 S.W.2d at 585. (Emphasis added.)

This rule has been consistently followed and restated. *City of Springfield v. Love,* 721 S.W.2d 208 (Mo.App.1986); *State ex rel. State Highway Comm. v. Graeler,* 527 S.W.2d 421 (Mo.App.1975); *State ex rel. State Highway Commission v. Carlson,* 463 S.W.2d 74 (Mo.App.1970); *Union Electric Company v. Saale,* supra. In this case, the appraisers were permitted to express their opinion of the value of an acre of the farm designated for multi-family or commercial use upon the basis of their opinion that there was a "reasonable probability" the farm would be rezoned to accommodate their unplatted concept of a PUD. An examination of the testimony of those appraisers concerning comparable sales establishes that they did not discount the value of a comparable sale of real estate zoned for commercial use or zoned for multi-family use. The testimony of those appraisers concerning their own opinion of damages did not conform to the long-established rule in this State. The admission of that testimony was erroneous and prejudicial.

■ Moreover, each appraiser was asked to assume Boles testified that he reasonably anticipated Scheme C and the Land–Use–Plan would be approved by the zoning authorities and to calculate damages upon the basis of the number of acres devoted to each use designated by those plans. Each appraiser responded by calculating damages by multiplying the number of acres platted for each use by their opinion of the value of an acre devoted to such use. In so doing, each appraiser expressed an opinion of value as if the farm had in fact been rezoned in accordance with Scheme C and the Land–Use–Plan. This is particularly significant because the ap-

praisers' calculation of damages upon the basis of Scheme C and the Land–Use–Plan is the only evidence that would support the verdict. See *State ex rel. State Highway Com'n v. Kemper,* 542 S.W.2d 798 (Mo. App.1976).

The failure of the appraisers to express their opinions of values of the property if rezoned for commercial use or multi-family use in the manner required by the established rule, quoted from *Sturmfels,* supra, must be considered in light of the Southwest Springfield Development Plan. The Plan was introduced in evidence, without limitation upon its use, by Modern Tractor. As stated, Kickapoo Prairie Farm is encompassed by that Plan. The general guidelines of the Plan include the following mandate.

*"Guideline #3*

PRESERVE MAJOR THOROUGHFARE ALIGNMENTS BY PREVENTING DEVELOPMENT WITHIN CORRIDORS DESIGNATED AS RIGHTS–OF–WAY FOR FUTURE THOROUGHFARES.

Intent: To insure that facilities on the Major Thoroughfare Plan can be built as planned. To prevent encroachment of subdivision development upon corridors needed for future thoroughfares. To maintain continuity of the thoroughfare system across political jurisdictions.

The development of new or expanded major thoroughfares is a lengthy process involving years of planning, design, environmental studies, securing funding, acquiring right-of-way, and actual construction. Often subdivision development occurs before public investments can be made in major thoroughfare improvements. Unless measures can be taken to protect rights-of-way in advance of actual construction, completion of new thoroughfares may be impeded by intervening developments.

There are several tools for protecting rights-of-way from encroachment by development. The most effective is advance acquisition of the right-of-way through actual purchase; however, funding limitations often preclude this ap-

proach. Another method is to officially map street rights-of-way and to deny building permits within such mapped corridors. This power has been effectively exercised by the city on several occasions to reserve future street corridors; however, it has seldom been applied in unincorporated portions of Greene County where much of the subdivision activity has occurred in recent years. A third method of protecting thoroughfare corridors is the subdivision process itself, which establishes the precise alignment of all streets. In the subdivision process, care should be taken to insure that adequate right-of-way is dedicated to accommodate all planned thoroughfares and that streets align properly from one subdivision to the next. A fourth tool which should be employed to help preserve thoroughfare corridors is zoning. Although zoning itself has no direct effect on street alignments, the rezoning of vacant land to higher intensities can significantly increase the cost of right-of-way acquisition, since land must be purchased at its fair market value. *If land adjoining a designated corridor for an expressway or freeway is rezoned to a more intense use, the land within the corridor should not be rezoned but should be maintained as a reserve strip so that it can be acquired at a lower public cost at a future date. ...*"
Southwest Springfield Development Plan, pp. 100–101 (June 1984). (Emphasis added.)

The corridor for the James River Freeway, including the right-of-way through the farm, was described in detail and platted in the Southwest Springfield Development Plan. The mandate of the Southwest Springfield Development Plan concerning that corridor was not recognized by the appraisers as a factor bearing upon their prognostications of rezoning of the farm. For a discussion of factors which establish a prerequisite basis for the admission of testimony concerning the probability of rezoning, see *State ex rel. State Highway Commission v. Carlson,* supra. The weight of the mandate of the Plan should

not be evaluated and ignored by an opinion of "reasonable probability".

It could be contended consideration of that mandate of the Southwest Springfield Development Plan is barred by the doctrine of "project influence". That doctrine has received the following general expression.

"In Missouri, this doctrine was adopted in *St. Louis Electric Terminal Ry. Co. v. MacAdaras,* 257 Mo. 448, 166 S.W. 307 (1914) (en banc), where the court said at 310:

'The proper rule, when the whole property is being taken, is not to allow the jury to consider either enhancements or depreciation brought about by the construction of the improvement for which the property is being taken. In other words, the value should be determined independent of the proposed improvement.' " *Kansas City Power & Light Co. v. Jenkins,* 648 S.W.2d 555, 560 (Mo.App.1983).

But see:

"In addition, with regard to the *taking* clause of the Fifth Amendment of the United States Constitution, the Supreme Court in *Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939) said, 'A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as "taking" in the constitutional sense.' *Id.* at 285, 60 S.Ct. at 236." *State ex rel. Wash. University v. Gaertner,* 626 S.W.2d 373, 376 (Mo. banc 1982).

█ In any event, the doctrine of project influence has not been applied without limitation in respect to the rezoning of property, a portion of which is taken by the power of eminent domain. The basic standard has been stated:

"The legislative body's enactment is clothed with a presumption of validity, and he who would challenge the reasonableness of the ordinance as applied to specific property has the burden of proving unreasonableness ... These concepts apply equally to rezoning and refusal to

rezone. ..." *Vatterott v. City of Florissant*, 462 S.W.2d 711, 713 (Mo.1971). (Citations omitted.)

A subsidiary standard is also recognized. "Since there is no absolute right to have property zoned for its most valuable commercial use, zoning does not constitute a compensable taking merely because it prohibits such use." *Elam v. City of St. Ann*, 784 S.W.2d 330, 338 (Mo.App.1990).

Those standards are applicable to "contract" or "conditional" rezoning of a tract of real property. A condition often imposed is the dedication of a portion of the property for a right-of-way for a public highway. The doctrine and an example of its use has been summarized.

"Dedication of some property to the local government in exchange for rezoning of other property is a form of contract, or conditional, rezoning. Rathkopf, *The Law of Zoning And Planning*, § 27.05, pp. 27–45 (1989). Contract rezoning occurs when 'a county or municipality exercises its power to rezone in exchange for considerations given by or exacted from ... [a] developer.' *Treme v. St. Louis County*, 609 S.W.2d 706, 716 (Mo.App.1980). Since rezoning which is reasonably probable may be considered when determining just compensation for taken property, we believe that a reasonable probability of dedication, as a prerequisite to rezoning, may likewise be a proper element of damages in a condemnation case. A reasonable probability that taken property would have had to be dedicated in exchange for reasonably probable rezoning may be relevant to determination of the value of property never actually taken, if the probability of dedication had a quantifiable impact on the property's worth.

Contract rezoning is constitutional only 'where the offer made or the exaction demanded for the rezoning bears [a] ... reasonable relationship to the activities of the developer ...' *Treme, supra,* 609 S.W.2d at 716. *See also, State ex rel. Noland v. St. Louis County*, 478 S.W.2d 363, 367 (Mo.1972). If no reasonable relationship exists between the exaction de-manded and the development, the 'contract' between the rezoning authority and the developer is an unconstitutional contracting away of the police power in violation of Art. 11, § 3, Mo. Const. *See Treme.* Arguably, this unconstitutional contract is also a 'taking' without just compensation in violation of Art. 1, § 26, Mo. Const." *State ex rel. Missouri Highway and Transportation Commission v. Sturmfels Farm Ltd. Partnership*, 795 S.W.2d at 586. (Omission in original.)

In that case, 65 acres were, after the taking for state highway purposes by the Commission's payment into court of the condemnation commissioners' award, rezoned upon condition of the dedication of the right-of-way appropriated. The trial court refused to admit evidence of that condition. The Court of Appeals reversed with the following instructions.

"On remand, the trial court should conduct a hearing prior to trial on the legal issue of whether dedication would have been constitutional. If the court concludes there is no reasonable relationship between a dedication requirement and development of defendants' remaining property, it must exclude evidence concerning the prospect of dedication in the new trial, unless that evidence is relevant to some material issue other than dedication, for example, the reasonable probability of rezoning.

If, on the other hand, the court determines that dedication of the right-of-way sought by the Commission would have been constitutional, the court must allow the Commission to present evidence on the factual issue of whether a dedication requirement was reasonably probable prior to the condemnation of defendants' property. Factors relevant to proof of the probability of zoning changes in general, and the probability of dedication as a precondition to rezoning in particular, include neighborhood changes, general changes in land use, and a pattern of prior similar actions by the zoning authority. See Nichols, *supra,* Section 12C.03[3]." *Sturmfels* at 588.

A second example is found in *Marvin E. Nieberg Real Estate Co. v. St. Louis County*, 488 S.W.2d 626 (Mo.1973). In *Nieberg*, the Commission told the zoning authority it wanted 3.253 acres of a 20.045 acre tract excluded from rezoning as it planned to acquire that 3.253 acres for highway purposes. The rezoning omitted the 3.253 acres and the landowner did not appeal. Those acres were not so appropriated. The court denied the landowner's claim that the action of the Commission constituted an "inverse condemnation". In affirming that denial, the Supreme Court said:

> "Ken Realty had no right to have its property rezoned in any particular way. It had no right to a better, higher, or more commercially valuable use. The zoning authorities had a discretionary power to rezone part but not all of a tract proposed for rezoning and the exercise of that discretion has not been challenged in the proper manner." *Id.* at 631.

The doctrine of conditional rezoning is the basis for Modern Tractor's recognition that a prerequisite to the development of Scheme C would be a dedication of additional right-of-way for and the improvement of Republic Road adjoining the farm on the south. That doctrine has very recently been applied upon the basis of an ordinance that required the dedication of the portion of property to be rezoned to a PUD within fifty feet of the centerline of a highway. The trial court refused to consider evidence of the requirement of dedication. The Court of Appeals reversed a judgment for the landowner and said:

> "Where there is evidence that subdivision of property will be necessary to achieve the property's highest and best use, a reasonable probability of a dedication requirement is a proper element of damages. The trial court erred to MHTC's prejudice, by refusing MHTC's evidence in regard to the need for dedication of the property within 50 feet of the centerline of Highway 58." *State ex rel. Missouri Highway and Transportation Commission v. Mike A. Christie, et al.,*

835 S.W.2d 328, 331 (W.D.Mo.App.1992) (Application for transfer pending).

Also see 2 Rathkopf, *The Law of Zoning and Planning*, § 29A.02. Cf. *Home Bldrs. Ass'n, Etc. v. City of Kansas City*, 555 S.W.2d 832 (Mo. banc 1977).

■ The mandate of the Southwest Springfield Development Plan was clear. It demanded consideration by the appraisers. The error of the trial court in permitting the appraisers to value unidentified portions of the farm as commercial property and as multi-family property, contrary to the established rule, upon a vague standard of "reasonable probability" of rezoning is made egregious by the Southwest Springfield Development Plan.

■ Finally, the Commission argues the trial court erred in permitting the appraisers to give opinions of value and damages upon the basis of Scheme C and the Land–Use–Plan because those opinions were based upon the opinion of Boles. The general rule relied upon by the Commission has received the following expression.

> "Traditionally, the courts have adhered to the broad principle that although a hypothetical question is not objectionable if it calls for an opinion based upon facts related by other witnesses, including experts, the question may not incorporate as an assumption the opinion of another expert on all or some of the matters to be considered by the expert from whom an answer is sought." Annot., *Expert Witness—Hypothetical Questions*, 56 A.L.R.3d 300, 337 (1974). (Footnote omitted.)

Also see *6816.5 Acres of Land, Etc., Rio Arriba Co., N.M. v. United States*, supra; 31A Am.Jur.2d, *Expert and Opinion Evidence*, § 105; Annot., *Information Relied on by Experts*, § 2[a], 49 A.L.R.Fed. 363, 365 (1980); *Hays v. Hogan*, 273 Mo. 1, 200 S.W. 286 (1917). However, numerous exceptions to that general rule were developed and recognized. The subject is now encompassed by a statute derived from the Federal Rules of Evidence. The relevant part of the statute provides:

> "The facts or data in a particular case upon which an expert bases an opinion or

inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable." § 490.065.3.

Also see Federal Rules of Evidence § 703. The scope of the principle embodied in that statute and rule has been recognized in the following language.

"An expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in *other fields....*" *United States v. 1,014.16 Acres of Land,* 558 F.Supp. 1238, 1242 (1983). (Emphasis added.)

In this case, each appraiser had formed and expressed an opinion concerning the percentage or number of acres of the farm that should be devoted to commercial and multi-family use in order to achieve the highest and best use of the farm as a PUD. They were then asked to disregard their opinion and value the farm upon the basis of Boles' opinion. They did so by the calculation set forth above. This presented a misleading appearance that the value so calculated was each witness's opinion of damages. Boles' opinion concerning the composition of the proper PUD was not "data ... of a type reasonably relied upon" by each appraiser in forming his own expert opinion to the contrary. See *Chicago & Illinois Midland v. Crystal Lake,* 225 Ill.App.3d 653, 167 Ill.Dec. 696, 588 N.E.2d 337 (1992).

"We caution also that if the testifying expert merely acts as a conduit for another non-testifying expert's opinion, the 'expert opinion' is hearsay and is inadmissible, Rule 703 notwithstanding. *Id.* at 703–25 n. 23; *see also United States v. Williams,* 431 F.2d 1168, 1172 (5th Cir.1970) (applying pre-Rule 703 law, an expert who consults and merely summarizes the content of a hearsay source without applying his own expertise is merely a hearsay witness [footnote omitted])." *State v. Lundstrom,* 161 Ariz. 141, 776 P.2d 1067, 1074 (1989), 89 A.L.R.4th 437, 451 (1991).

The use of Boles' opinion embodied in the plats to elicit testimony of damages by each appraiser was not authorized under § 490.065.

The Commission also contends the trial court erred in refusing to give three instructions tendered by the Commission. This point can best be understood by a recapitulation, by title, of the instructions specifically applicable to eminent domain proceedings given in this action. Those instructions, and the order in which they were given, are:

No. 4—MAI (4th Edition) 31.05

[1981 Revision] Verdict Directing—Eminent Domain (without a "tail")

No. 5—MAI (4th Edition) 3.02

[1981 Revision] Burden of Proof—Eminent Domain

No. 6—MAI (4th Edition) 9.02

[1965 New] Damages—Eminent Domain—Part of Property Taken

No. 7—MAI (4th Edition) 34.03

[1969 New] Withdrawal Instructions—General Benefits—Eminent Domain

No. 8—MAI (4th Edition) 16.02

[1978 Revision] Definition—Fair Market Value

Only one form of verdict was given, that being patterned on "Verdict A" of MAI (4th Edition) 35.09—Illustrations.

The Commission contends the trial court erred in not giving tendered instruction "C", which was MAI (4th Edition) 31.05 with the "tail" providing "unless you believe defendant is not entitled to recover by reason of Instruction Number D." Tendered instruction "D" provided that the jury's verdict must be that the defendant sustained no damage if the value of the special benefits to the defendant's property was equal to or greater than the damages resulting from the taking of defendant's property. Tendered instruction "E" purported to define "special benefits" accruing to defendant's remaining property as bene-

fits "which are a direct result of the construction of the James River Freeway and Cox Road Connector". The Commission argues that the tendered instructions were erroneously refused because MAI (4th Edition) 31.05 provides for an "affirmative defense" of special benefits.

The Supreme Court, under former versions of MAI instructions applicable to proceedings in eminent domain, has given a definitive answer to the Commission's contention.

> "Under MAI 9.02, the city may not give a separate instruction on benefits, but it will be entitled to argue special benefits to the jury *if* on retrial there is evidence before the jury to show special benefits to this landowner." *Bueche v. Kansas City,* 492 S.W.2d 835, 842 (Mo. banc 1973). (Emphasis in original.)

The relevant "Committee's Comment" to MAI (2d Edition) 9.02—Damages—Eminent Domain—Part of Property Taken, was: "The Committee considered preparing a separate special benefits instruction but rejected the idea because special benefits can be covered by argument within the framework of the above instruction." That express explanation has not been repeated in MAI (4th Edition) 9.02. Nevertheless, it is implicit in the Committee's Comment to that instruction. "This instruction is appropriate whether or not special benefits to defendant's remaining property are in issue." That explanation is also implicit in the fact that there is no pattern instruction defining "general benefits" or "special benefits".

■ It is true that *Bueche* was decided when MAI (2d Edition) 31.05 did not include a provision of a "tail" for an affirmative defense. However, the concept of special benefits is not that of an affirmative defense. Special benefits are an off-set which may or may not equal or exceed damages to a defendant's remaining land sustained by reason of the taking. *State ex rel. State Highway Com'n v. Gatson,* 617 S.W.2d 80 (Mo.App.1981); *State ex rel. State Hy. Com'n v. Southern Develop. Co.,* 509 S.W.2d 18 (Mo.1974). Instruction "C", tendered by the Commission, could

tend to cause a jury to ignore special benefits to the remaining property unless they equaled or exceeded the damages. "Special benefits" to a defendant's remaining land is not an affirmative defense authorized by MAI (4th Edition) 31.05.

What is an affirmative defense authorized by that instruction is not apparent. MAI (1st Edition) 26.05—Verdict Directing—Eminent Domain (predecessor to MAI (4th Edition) 31.05—Verdict Directing— Eminent Domain) had no "tail". The tail could have been added because the instruction was patterned upon MAI (4th Edition) 26.05—[1980 Revision] Verdict Directing— Quantum Meruit—Goods or Services Furnished. Or perhaps such a tail may be applicable to actions in "inverse condemnation". See *Stewart v. City of Marshfield,* 431 S.W.2d 819 (Mo.App.1968); *Barr v. KAMO Elec. Corp., Inc.,* 648 S.W.2d 616 (Mo.App.1983).

The Commission also argues that unless MAI (4th Edition) 31.05 is given with such a tail, MAI (4th Edition) 9.02 could appear to authorize a verdict for the defendant even though a jury might believe special benefits equaled or exceeded damage to the remaining property. This contention is not valid. Whether or not special benefits exceed general damages resulting in no damage to the defendant, can be argued under MAI (4th Edition) 9.02. That proposition can also be submitted to the jury in the form of a "converse instruction" to MAI (4th Edition) 31.05. Rule 70.02(f). Also see "Instruction No. 3" of MAI (2d Edition) 35.09—Illustrations, and *City of Gladstone v. Hamilton,* 463 S.W.2d 622 (Mo.App. 1971). This proposition can also be reflected in the modification of the Form of Verdict to be submitted to the jury as noted in the Committee's Comment to "Verdict A", 35.09 (4th Edition)—Illustrations. An appropriate modification results in two forms of verdict. See "Forms of Verdict", MAI (2d Edition) 35.09—Illustrations. The trial court did not err in refusing tendered instructions "C" "D" and "E".

The Commission has also emphatically asserted the trial court erred in admitting the testimony of the five appraisers con-

cerning values and damages based upon Scheme C and the Land–Use–Plan of Boles because "such opinions were not disclosed to respondent [sic] prior to trial in violation of respondent's continuing duty to supplement discovery". The basis for this contention is very unlikely to be presented in a retrial. The point need not be further considered.

The trial court erroneously admitted testimony prejudicial to the Commission. The judgment is therefore reversed and the cause remanded for a new trial.

MONTGOMERY, J., concurs.

SHRUM, P.J., concurs and files concurring opinion.

SHRUM, Presiding Judge, concurring.

I concur without reservation in the principal opinion. I write separately to emphasize a point made in the principal opinion, namely, that not every expert opinion that is based in part on another expert's opinion is inadmissible.

In this case, however, the five experts had already formed independent opinions about the highest and best use of the farm, opinions they were asked to disregard. When the five experts offered their "opinions" of the value of the farm based on Boles's opinion, they were, in effect, simply testifying about the results of their arithmetic calculations; they were no longer offering expert testimony. Under these circumstances, their testimony was prejudicial error.