STATE of Missouri, ex rel. MISSOURI HIGHWAY & TRANSPORTATION COMMISSION, Plaintiff/Respondent,

v.

Harry EDELEN, et al., Exceptions of Select Properties, Defendants/Appellants.

No. 63044.

Missouri Court of Appeals, Eastern District, Division Four.

Feb. 15, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 15, 1994.

Application to Transfer Denied April 26, 1994.

Marvin Max Klamen, Donna Aronoff Smith, St. Louis, for defendants-appellants.

Philip Edward Morgan, Jr., St. Louis, for plaintiff-respondent.

CARL R. GAERTNER, Judge.

Defendant, Select Properties (Select), appeals from a judgment entered on a jury verdict awarding the corporation $600,000 for the condemnation of a portion of its property by the Missouri Highway and Transportation Commission (Commission).

Select's property, a 9.65–acre parcel located in the southwest quadrant of the intersection of Interstate Highway 270 and Missouri Bottom Road in St. Louis County, fronts I–270 along its west-by-northwest border and Missouri Bottom Road along its north-by-northeast border. The land was zoned industrial but remained vacant from the time Select acquired it in the late 1960s until the date of taking.

There was no direct egress from I–270 to Missouri Bottom Road or access from Missouri Bottom Road to I–270. On June 23, 1989, the Commission filed a condemnation petition to take various land parcels, including a portion of Select's property, to improve

the traffic flow at I–270 and Missouri Bottom Road. The Commission planned to widen Missouri Bottom Road, to provide an access ramp from Missouri Bottom Road to the southbound lanes of I–270, and to build a directional interchange from Route 115 to I–270 west of Select's property and thereby provide egress from the northbound lanes of I–270 to Missouri Bottom Road. In accord with its plan, the Commission sought to take 206,065 square feet of Select's property.

On November 6, 1989, the Commission filed its Second Amended Petition in which it changed the amount of Select's property to be taken to 256,699 square feet. On January 18, 1990, the commissioners appointed by the court returned an award of $744,319.25 for Select. Both parties filed exceptions and requested a jury trial. The jury returned a verdict on July 31, 1992, awarding Select $600,000 for the taking, and the trial court entered judgment in accord with the verdict.

## I.

■ In its first point, Select claims the trial court erred in refusing to give the jury MAI 34.03, which Select requested.

The Commission's expert witness, Thomas Garnett, testified that the remaining parcel of Select's land increased in value after the taking because the ensuing highway project would provide Select direct access to and egress from I–270, which changed the land's highest and best use from industrial to commercial applications. Select argues that the increased access and egress did not accrue only to Select's property; therefore, the trial court erred in failing to give 34.03 to prevent the jury from considering this evidence of a general benefit as an offset against Select's damages.

It is error to refuse to give 34.03 when requested by defendants in a partial condemnation proceeding regardless of whether there is evidence of general benefits. *State ex rel. Hwy. & Transp. Com'n v. Jim Lynch Toyota,* 830 S.W.2d 481, 488–89 (Mo.App. 1992); *State ex rel. State Hwy. Com'n v. Recker,* 648 S.W.2d 568, 570 (Mo.App.1983). The trial court, therefore, erred in refusing Select's request to give MAI 34.03. Our inquiry, however, does not end here. Rule

70.02(c) requires a determination of whether this error was prejudicial. *Jim Lynch Toyota* 830 S.W.2d at 489.

■ It is well-settled that in a partial condemnation case the condemnor may set off the landowner's damages with evidence of special benefits to the remainder of the property, but general benefits may not be set off. A special benefit is one that accrues directly and proximately to the particular land remaining after a partial taking, reflecting an increase in the market value of the remainder. General benefits, on the other hand, accrue to all properties within the usable range of the public work. *State ex rel. State Hwy. Com'n v. Tate,* 592 S.W.2d 777, 778–79 (Mo. banc 1980); *State ex rel. State Hwy. Com'n v. Koziatek,* 639 S.W.2d 86, 88 (Mo. App.1982); *State ex rel. State Hwy. Com'n v. Gatson,* 617 S.W.2d 80, 82 (Mo.App.1981).

The quintessential example of a special benefit is when highway construction improves the highest and best use of the landowner's remaining property. *Tate,* 592 S.W.2d at 779–80 (Mo. banc 1980); *Koziatek,* 639 S.W.2d at 88. The Commission presented evidence of an improvement in the highest and best use of Select's land due to the highway construction. We find no resulting prejudice from the trial court's failure to give MAI 34.03. Point denied.

## II.

Select next argues the trial court erred in denying its motion *in limine* to preclude or strike Garnett's testimony because his valuation opinion was speculative and based on inadmissible evidence of general benefits.

The Commission clearly established Garnett's qualifications to testify as an expert real estate appraiser. Garnett then testified that he appraised the land using the market data, or comparable sales, method because Select's land was undeveloped. *See State ex rel. State Hwy. Com'n v. Graeler,* 527 S.W.2d 421, 425–26 (Mo.App.1975). He testified that the highest and best use of Select's property before the condemnation was industrial and should be valued at $1.50 per square foot when compared with similar industrial property. He then testified that the condemna-

tion changed the property's highest and best use to commercial applications and should be valued at $2 per square foot when compared to the sale of similar land tracts. Using these figures, Garnett calculated that the property should be valued at $630,700 before the taking and $328,440 after the taking, leaving Select $302,260 in compensation for the condemnation.[1]

Select claims that Garnett's opinion was speculative and thus inadmissible because: (1) he failed to conduct a standard written appraisal with written supporting data quantifying and distinguishing the factors he examined in arriving at his valuation opinion; (2) his land measurements did not match the figures in the Commission's petition; (3) he failed to consider all of the factors set forth by the American Institute of Real Estate Appraisers; (4) he failed to consider as a comparable sale the sale of a land parcel directly across the street from Select's property; and (5) he failed to consider and quantify the reasonable cost of rezoning the remainder of Select's land. Select further claims Garnett relied on inadmissible evidence of general benefits in valuing the remainder of Select's property. Having already determined that Garnett relied on evidence of a special benefit, we do not need to consider this portion of Select's second point.

■ The admission or exclusion of evidence in condemnation cases is within the discretion of the trial court, and errors in the court's determination will not result in reversal unless there is substantial or glaring injustice. *State ex rel. Hwy. & Transp. Com'n v. Kuhlmann,* 830 S.W.2d 569, 571 (Mo.App. 1992); *Del–Mar Redevelopment Corp. v. Associated Garages,* 726 S.W.2d 866, 869 (Mo. App.1987). The admissibility of evidence in such cases depends on whether it tends to help the jury in resolving the issue of value and damages. *State ex rel. State Hwy. Com'n v. Texaco, Inc.,* 502 S.W.2d 284, 288 (Mo.1973). An expert opinion of the value of real property must be based upon substantial data, not mere conjecture, speculation or un-

warranted assumption. The opinion must have a rational foundation. *State ex rel. Mo. Hwy. & Transp. Com'n v. Modern Tractor and Supply Co.,* 839 S.W.2d 642, 648 (Mo. App.1992).

■ We note from the outset that such an expert is not required to conduct a written appraisal, to provide written supporting data, to quantify the factors he used in arriving at his valuation opinion, or to analyze the factors set forth by the American Institute of Real Estate Appraisers.

■ In his testimony, Garnett clarified how the comparable sales approach operates and why he chose this valuation method. In determining the land's highest and best use before and after the condemnation, he considered the land's zoning, the change in access to and egress from I–270, the development of a commercial project in the vicinity, and the development of commercial property near similar interchanges in St. Louis County. He chose comparable sales of property located near Select's land involving the same type of land use. Garnett testified to the specific features of each comparable property and indicated that after determining the range of prices generated by the sale of these properties he analyzed each one's location, size, shape, access to thoroughfares, and topography, which he compared with Select's property before determining what price within the range he should assign to Select's parcel.

Although Garnett offered measurements which deviated from the Commission's figures by 453 square feet, he clarified that at the time of his appraisal there was confusion between the parties regarding the land measurements, which prompted him to calculate his own figures after talking to various people, visiting the site and viewing documents.

Furthermore, Garnett offered a rational explanation and supporting data for his refusal to consider as a comparable sale the sale of an Emerson Electric Company land

1. The jury was presented with disparate measurements of the amount of property taken and the land remaining after the condemnation. The Commission noted in its Second Amended Petition that it was taking 256,699 square feet. Se-

lect claimed the Commission took 255,681 square feet, leaving a remainder of 164,786 square feet. Garnett, however, testified that 256,246 square feet were taken, leaving a remainder of 164,220 square feet.

parcel directly across the street from Select's property. Garnett testified that this sale was not an arm's-length transaction because it involved interrelated companies and it was a unique real estate transaction because various land parcels were exchanged, rendering the transaction unsuitable for use as a comparable sale.

■ Finally, Garnett testified that he was aware that Select's remaining property would have to be rezoned because of the change in its highest and best use. He further testified that he considered this factor in evaluating the remaining parcel's value. We have held that it is proper to take into account the reasonable probability of a change in zoning just before or after condemnation if it affects the market value of the property at either time. *Modern Tractor,* 839 S.W.2d at 650 (Mo.App.1992). However, in doing so, the property must be evaluated under the zoning restrictions existing at the time of condemnation, and consideration must be given to the impact on market value of the likelihood of a zoning change. This may be accomplished either by valuing the subject property as rezoned, minus a discount factor to allow for the uncertainty that rezoning will actually take place, or by valuing the property with its existing zoning, plus an incremental factor indicating the probability of rezoning. *Id.* at 650–51. Garnett followed the former procedure by valuing the property as if it were rezoned commercial and adjusting its value to account for the cost of rezoning.

The record clearly indicates that Garnett supported his opinion with substantial data. Select's objections to his testimony call into question his failure to provide specific, quantitative value adjustments for each factor he considered. In essence, these objections impugn the credibility and weight that should be accorded Garnett's testimony. The jury is the sole judge of the credibility of witnesses and the weight and value of their testimony. *Georgescu v. K Mart Corp.,* 813 S.W.2d 298, 299 (Mo. banc 1991). The objections go to the weight of the evidence, not its admissibility. Therefore, in overruling Select's motion to strike, the trial court appropriately limited Select to raising these objections in its cross-examination of Garnett. Point denied.

### III.

In its final point, Select claims the trial court erred in prohibiting it from offering evidence of condemnation blight, the need for using an alternative valuation method, and the valuation of its property using this method.

At the outset of the trial, the Commission filed two motions *in limine.* In the first motion, the Commission sought to preclude Select from offering evidence that the Commission's delay in condemning land for the highway project blighted the area market, distorting and depressing the value of Select's land. The trial court overruled this motion, opting instead to rule on the admissibility of Select's evidence as it was presented. In its second motion, the Commission sought to preclude Select from offering evidence that the capitalization of income method should be applied to the evaluation of its property. The trial court sustained this motion. During the trial, the court prevented Select from offering evidence of condemnation blight but permitted it to make various offers of proof.

The Commission began considering condemning Select's land for the expansion of I–270 in early 1980. In 1984, the project was changed to include the improvement of Route 115 at the intersection of I–270 and Missouri Bottom Road. These projects went through various preliminary planning stages, including public hearings. If anyone asked the Commission about Select's parcel during this time, they were shown the most current proposed plans.

In October 1988, the Commission approved the right-of-way plans for the condemnation of Select's property. However, in January 1989, the Commission discovered an error in the right-of-way delineation. The Commission approved a revised right-of-way plan for condemnation on April 7, 1989. Throughout this period, Jerome Glick, the owner of Select, met a few times with the Commission and was told a negotiator would contact him concerning the taking. In a letter dated February 13, 1989, Glick informed the Com-

mission that he intended to develop the subject parcel into an industrial park because the Commission delayed its projects involving his land since 1980 and had failed to send a negotiator to talk with him. On March 8, 1989, Glick applied with the St. Louis County Planning Department to replat the land for the planned industrial park. The application was placed on hold.

Select made a further offer of proof that the St. Louis County Planning Department would not approve any applications to plat land under the threat of condemnation without the condemnor's approval. Furthermore, Select claimed its land was zoned industrial in 1965 with the intention that there would be a highway extension across it in the future.

Select also made offers of proof concerning offers to purchase real estate near Select's land. In the year before the condemnation, a series of offers were made to purchase the lot adjacent to Select's property. The final offer was accepted but was contingent on obtaining zoning to use the land as a cement plant. The zoning and contingency use failed; thus, the sale was never consummated. The second offer concerned the Emerson property across the street from Select's lot. The Residence Inn, a hotel chain, made an offer to purchase the property which was rejected. The offer was for a higher price than the ultimate sale price of the property.

Select claims the above evidence provided a foundation for the excluded valuation testimony of its expert appraiser, Ernest Demba. Demba concluded that by delaying the highway construction project and interfering with the development and sale of land in the path of the taking the Commission effectively blighted the entire area market, thereby suppressing and distorting the true value of Select's land. Demba would have further testified that the comparable sales method could not adequately expose this value depression, necessitating an alternative valuation method. Finally, Demba would have testified to the value of the land based upon an appraisal he conducted using the capitalization of income method. The trial court rejected all of these offers of proof.

Our courts have approved three methods for arriving at the fair market value of real estate: "comparable sales," "cost of replacement" and "capitalization of income." *State ex rel. State Hwy. Com'n v. Southern Development Co.*, 509 S.W.2d 18, 27 (Mo. 1974); *Del–Mar Redevelopment Corp. v. Associated Garages*, 726 S.W.2d 866, 869 (Mo. App.1987). The "capitalization of income" approach is used to value income-producing property when it is completely taken. *Southern Development*, 509 S.W.2d at 27. This method was inappropriate in the instant case because Select's property was a vacant, unimproved lot, and the Commission only condemned a portion of it. *Id.; see also State ex. rel. State Hwy. Com'n v. Mann*, 624 S.W.2d 4, 10 (Mo. banc 1981); *Northeast Mo. Elec. Power Co-op v. Fulkerson*, 542 S.W.2d 26, 28 (Mo.App.1976). The court properly excluded Demba's appraisal testimony.

The admissibility of the other excluded evidence presents a more complex issue. Select claims this evidence demonstrates that a cloud of threatened condemnation hung over its land since 1980, precluding it from selling the land to any knowledgeable buyer. Furthermore, Select argues its failed attempt to develop its land into an industrial park and the failed attempt to sell the lot adjacent to Select's parcel indicates that artificial limitations of use existed on all the land in the path of the Commission's planned condemnation. These limitations, Select argues, depressed the entire area market and distorted the value of its land. Select concludes this evidence should have been admitted because it is necessary to fully inform the jury of all factors relevant to its determination of the value of the subject land and the appropriate compensation for the taking. *State ex rel. Hwy. Com'n v. Jim Lynch Toyota*, 830 S.W.2d 481, 485 (Mo.App.1992); *Del–Mar*, 726 S.W.2d at 871; *Mo. State Park Board v. McDaniel*, 473 S.W.2d 774, 779 (Mo.App. 1971).

In a condemnation proceeding, compensation is determined as of the date of taking, which does not occur until the condemnor pays the commissioner's award into the registry of the court. Mo. Const. art. I, sec. 26; *State ex rel. Mo. Hwy. & Transp. Com'n v. Starling Plaza Partnership*, 832

S.W.2d 518, 520 (Mo. banc 1992); *Western Robidoux Printing & Lithographing Co. v. State Hwy. Com'n,* 498 S.W.2d 745, 748 (Mo. 1973). When a portion of a land tract is condemned, the proper measure of damage is the difference between the fair market value of the entire property before the taking and the fair market value of the remainder after the taking. *Starling Plaza,* 832 S.W.2d at 520; *State ex rel. Mo. Hwy. & Transp. Com'n v. Horine,* 776 S.W.2d 6, 12 (Mo. banc 1989). It is not unusual for a long time to elapse between the time an area is threatened with condemnation or declared blighted and the time when the property is taken. Often during this period, the land plummets in value. *See State ex rel. Washington University v. Gaertner,* 626 S.W.2d 373, 375–76 (Mo. banc 1982); *Roth v. State Hwy. Com'n,* 688 S.W.2d 775, 777 (Mo.App.1984).

Under current condemnation law, however, there is no procedure for compensating a landowner for such a decline in the value of his property, unless there is evidence of aggravated delay or untoward activity by the condemnor. *Washington University,* 626 S.W.2d at 376; *Roth,* 688 S.W.2d at 777 (Mo.App.1984).[2] In order to have a compensable taking under Art. I, sec. 26, of the Constitution of Missouri, "there must be an invasion or an appropriation of some valuable property right which the landowner has to the legal and proper use of his property, which invasion or appropriation must directly and specially affect the landowner to his injury." *Hamer v. State Hwy. Com'n,* 304 S.W.2d 869, 871 (Mo.1957). The threat of condemnation is neither a taking nor an element of damages in a condemnation suit. *Id.* at 872; *Gould v. Land Clearance for Redevelopment Authority of Kansas City,* 610

S.W.2d 360, 366–67 (Mo.App.1980); *State ex rel. State Hwy. Com'n v. Armacost Motors of St. Louis,* 552 S.W.2d 360, 365 (Mo.App. 1977).

There was a delay in the condemnation of Select's land. However, the excluded evidence does not reveal any specific evidence demonstrating aggravated delay, bad faith or untoward activity by the Commission. Select's offers of proof were an attempt to enter evidence of precondemnation damages caused by the Commission's threat of condemnation. Under the above-cited cases, therefore, the trial court properly excluded the evidence.

We understand Select's frustrating plight. While the sword of condemnation hung precariously overhead for 10 years, Select had to watch its property value decline without being able to sell the land, develop it or seek legal recourse. The market value of its property, and nearby property as well, suffered a continual decline during the years of publicity concerning the pending condemnation. While other jurisdictions have begun permitting some compensation for precondemnation damages caused to land due to the threat of condemnation, *see* Julie Crittenden Dunkin, *Denial of Landowner's Counterclaim: Another Obstacle on the Road to Just Compensation,* 50 UMKC L.Rev. 353, 361–64 (1982), the rigidity of our condemnation procedure prevents us from any such progressiveness without the legislature's approval or a change in Supreme Court Rules of Civil Procedure.[3] *See Washington University,* 626 S.W.2d at 378.

Finally, we must address Select's claim that the evidence of offers to purchase Select's land and other land in the vicinity

---

**2.** We are aware that the court in *Washington University* in ruling that a counterclaim was impermissible in a condemnation case indicated that the landowner could bring a separate cause of action sounding in tort for precondemnation damages. *Washington University,* 626 S.W.2d at 377–78. However, the court specifically limited this option to actions for loss of rental income due to condemnation blight. *Id.* at 376, 377–78. This option, therefore, is not available to Select.

**3.** In its opinion in *Washington University,* the Supreme Court vividly described the injustice sustained by a landowner by reason of a protracted delay between the declaration of blighting and the actual taking of the property by

eminent domain. The court noted the repeated failure of proposed legislation addressing the problem and the pendency of a proposed change in the Rules of Civil Procedure regarding counterclaims in condemnation cases. Based upon existing procedure and precedent pre-dating the advent of urban blighting, the court declined to provide a remedy for the landowner's loss. Subsequently, the Supreme Court did not adopt the proposed rule change and, despite recommendations of the Missouri Bar, the General Assembly has not enacted legislation calculated to eliminate, or at least alleviate, the injustice. The decision in *Washington University* has been severely criticized in the UMKC Law Review arti-

should have been admitted as evidence of comparable sales under the comparable sales method. A bona fide, unaccepted offer to buy land can be admitted as part of the *basis* for a real estate expert's opinion of value. The trial court, however, has great discretion over the admission of such evidence, and its decision will not be disturbed unless it results in manifest injustice. *State ex rel. State Hwy. Com'n v. Pfizer,* 659 S.W.2d 537, 541–42 (Mo.App.1983); *State ex rel. State Hwy. Com'n of Mo. v. Wetterau Foods, Inc.,* 632 S.W.2d 88, 90 (Mo.App.1982). We find no abuse of discretion by the trial court in the present case. Select offered this evidence to support its expert's valuation opinion, which was based on the capitalization of income approach. At no time did Select indicate its expert would offer an opinion of value based upon the comparable sales approach. This point is denied.

The judgment of the trial court is affirmed.

GRIMM, P.J., and AHRENS, J., concur.

cle cited above and in Bruce E. Castle, *Condemnation Blight: Compensating the Landowner in Missouri,* 48 Mo.L.Rev. 220 (1983).

We, of course, are constitutionally obligated to follow the controlling decision of the Supreme Court.